# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ ) | |
| EVAN SINGLETON and ) | |
| VITO LOGRASSO  ) ) | CIVIL ACTION NO. |
| ) | |
| ) | **3:15-cv-00425-VLB** |
| **v.** ) | |
| ) | |
| **WORLD WRESTLING ENTERTAINMENT,** ) | |
| **INC.** ) | |
| ) | |
| _____ ) | **May 22, 2015** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Evan Singleton and Vito LoGrasso ("Plaintiffs"), professional wrestlers, allege the following upon personal knowledge as to their own transactions and upon information and belief as to all other matters.

## INTRODUCTION

1.     This action concerns World Wrestling Entertainment, Inc.'s ("WWE") mistreatment of Plaintiffs, former wrestlers, as well as its concealment, failure to disclose, and denial of medical information pertaining to traumatic brain injuries they incurred while wrestling.[1]

2.     Plaintiffs have either developed symptoms of permanent, degenerative brain diseases such as dementia, Alzheimer's disease, ALS, or CTE, or are substantially more likely than the general population to develop such diseases in the future as a result of WWE's misconduct.  These injuries occurred on a cellular level.

---

[1] "World Wrestling Entertainment, Inc." and "WWE," as used in this Complaint, refer to the company in its current incarnation, along with all predecessor companies, including, but not limited to, Titan Sports, Inc., World Wrestling Federation, Inc., World Wrestling Federation Entertainment, Inc., World Championship Wrestling, Inc., and Extreme Championship Wrestling.

3.     WWE has known for years that repeated concussive and sub-concussive impacts substantially increase the probability that a wrestler will develop a permanent, degenerative brain disease.  Instead of disclosing this information to the wrestlers, WWE hid this necessary information and did so while preserving the huge profits of a brand built on a culture of unreasonably and unnecessary violent conduct.

4.     WWE took affirmative steps to mislead Plaintiffs into wrestling while injured, resulting in the accumulation of concussive and sub-concussive impacts without sufficient recuperation time.  The accumulation of head trauma is exponentially more dangerous than isolated blows, a fact WWE knew or should have known.  Yet, WWE failed to take adequate steps to prevent, or even disclose the risk of, these successive injuries.

5.     WWE's representations, actions, and inactions have caused Plaintiffs to suffer long-term debilitating injuries, lost income, premature retirement, medical expenses, and other losses as alleged herein.

6.     WWE failed to disclose in a timely manner the true risks of repeated traumatic head impacts in WWE wrestling, and failed to take appropriate steps to prevent and mitigate repeated traumatic head impacts (including sub-concussive blows and concussions) and latent brain injury.  Indeed, by refusing to acknowledge the risks it was creating—and by attempting to conceal those risks from its wrestlers—WWE effectively guaranteed that they would not seek the help they needed to avoid latent brain injury.

7.     When forced to acknowledge the risks to which it subjects its wrestlers—by script, on a daily basis—WWE took inadequate steps to correct the problem or to address its injurious conduct, the full consequences of which are still coming to light.  Indeed, WWE

continues a course of conduct designed to mislead Plaintiffs about the injuries they have sustained by failing to disclose pertinent facts or offering misleading half-truths.

8.     Plaintiffs seek a declaration of liability, injunctive relief, medical monitoring, and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by the Plaintiffs as a result of WWE's conduct, which resulted in Plaintiffs suffering brain trauma, concussions, and other related injuries.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs are residents of a different state from Defendant and because the value of the matter in controversy exceeds $75,000

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

11.     Plaintiff Evan Singleton is a citizen of Pennsylvania. He wrestled for WWE under the name Adam Mercer from 2012 to 2013.

12.     Plaintiff Vito LoGrasso is a citizen of Pennsylvania.  He wrestled with WWE from 1991 to 1998 and from 2005 to 2007.

13.     Defendant World Wrestling Entertainment, Inc. is a company existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut and it conducts business in this jurisdiction.

14.     Although WWE is a public company, it is controlled by a small group of related executives who manage both polices and the conduct of wrestlers during matches. Vincent K. McMahon has been Chairman of WWE since the retirement of his father, Vincent McMahon Sr., in 1980. Vincent K. McMahon has served as CEO from 1980 to 1993, and from 2009 to the

present.  McMahon controls over 80 percent of WWE's voting power. McMahon's wife, Linda McMahon, served as WWE President from 1993 to 2009, and as CEO from 1997 to 2009. Their daughter, Stephanie McMahon Levesque, is WWE's Chief Brand Officer. Her husband, Paul Levesque is Executive Vice President, Talent, Live Events & Creative.

## FACTUAL ALLEGATIONS

### I.    Background: WWE and Its Wrestlers

15.    WWE is the largest wrestling entertainment organization in the world. Since purchasing its main competitor, World Championship Wrestling, in 2001, WWE has had no serious competitors in the field of wrestling entertainment. The company generates approximately $500 million in revenue annually.

16.    The majority of WWE's revenues stem from its televised wrestling events.  WWE programs consistently rank among the most popular in weekly television ratings. WWE programming is broadcast in more than 170 countries and 35 languages and reaches more than 650 million homes worldwide.

17.    For nearly three decades, WWE has been the world's pre-eminent provider of pay-per-view programming, consistently ranking among the highest-selling live event programs in the world.

18.    WWE calls itself an "action soap opera."[2] Its events are scripted, with preordained winners and losers, and it has a carefully written, ongoing plot. WWE predetermines much of the dialogue between the wrestlers and the winners of the events, as well as many of the violent acts perpetrated by the wrestlers on each other.

---

[2] Examiner.com, "WWE to be called an 'action soap opera' not pro-wresting, Bans more terms" (Apr. 13, 2011), available at http://www.examiner.com/article/wwe-to-be-called-an-action-soap-opera-not-pro-wrestling-bans-more-terms.

19.    Many WWE wrestlers fight hundreds of times per year. And unlike professional athletes in traditional sports leagues, WWE wrestlers have no off-season in which to rest and recover from their injuries.

20.    Despite WWE's enormous revenues, WWE does not provide its wrestlers, past or current, with health insurance, disability insurance, or unemployment insurance. Wrestlers are effectively on their own.

21.    WWE scripts events and matches, including some moves.  The trainers, bookers, and other WWE employees, organize and oversee the action that takes place in each performance, effectuating WWE's scripts.

22.    Throughout the history of WWE, wrestlers, including Plaintiffs, look to and rely on their trainers, bookers, and WWE staff, both to provide specific direction from WWE, and to ensure their safety during performances.

## II.    The Science of Head Trauma

23.    This lawsuit concerns head injuries occurring in former and current WWE wrestlers. The primary classification of head injuries relevant to WWE are traumatic brain injuries ("TBIs," or colloquially, "concussions") and chronic traumatic encephalopathy ("CTE"). Concussions can cause CTE, but are not the only cause: repeated sub-concussive head trauma also causes CTE. Over their career, WWE wrestlers suffer repeated concussions and countless sub-concussive blows.

24.    Concussions have no standard definition, and require complex diagnosis based on clinical signs, observed symptoms, neuroimaging, medical records and personal interviews.[3] The

---

[3] National Center for Injury Prevention and Control, "Report to Congress on Mild Traumatic Brain Injury in the United States: Steps to Prevent a Serious Health Problem" 1 (2003), available at http://www.cdc.gov/ncipc/pub-res/mtbi/report.htm.

Centers for Disease Control and Prevention ("CDC") define concussions as a type of TBI caused by a "bump, blow, or jolt to the head or body."[4] A blow to the head that does not cause a concussion, or that has not been diagnosed to cause a concussion, is commonly referred to as a sub-concussive blow.

25.     Many concussions go undiagnosed and untreated. Though concussions are often associated with a loss of consciousness, the majority of concussions are not so obviously recognized.

26.     Even absent a loss of consciousness, each concussion alters the way the brain functions.  Symptoms can include headaches and problems with concentration, memory, balance coordination, loss of consciousness, confusion, disorientation, nausea, vomiting, fatigue or drowsiness, difficulty sleeping, sleeping more than usual, and seizures.[5]

27.     Post-concussion syndrome remains with a person for days, weeks or even months. Indeed, while, "[s]ome of these symptoms may appear right away. . . others may not be noticed for days or months after the injury."[6] In some cases, concussions can cause bleeding in the brain, which can be fatal.[7]

28.     Repeated blows sustained without sufficient recovery time are exponentially more dangerous. Sometimes called "second impact syndrome," multiple blows can *amplify* the original injury. According to the Mayo Clinic, "[e]xperiencing a second concussion before signs and

---

[4] Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), available at http://www.cdc.gov/concussion/signs_symptoms.html.

[5] Mayo Clinic, "Post-Concussion Syndrome: Definition," (Aug. 19, 2014), available at http://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/basics/definition/con-20032705.

[6] Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), http://www.cdc.gov/concussion/signs_symptoms.html.

[7] Mayo Clinic, "Concussions: Causes" (Apr 2, 2014), available at http://www.mayoclinic.org/diseases-conditions/concussion/basics/causes/con-20019272.

symptoms of a first concussion have resolved may result in rapid and usually fatal brain swelling."

29.     CTE is a disorder caused by neurodegeneration including cognitive and neuropsychiatric symptoms. Long-known as dementia pugilistica or punch-drunk syndrome, an increasing consensus has emerged that mild and infrequent trauma can cause similar long term neurological effects to those experienced by boxers.

30.     CTE is a permanent change to brain structure caused by repeated blows. CTE's accompanying symptoms include depression, dementia, cognitive impairment, Parkinsonism, personality change, speech and gait abnormalities. Unlike concussions, CTE can only be diagnosed with direct tissue examination, which can detect an elevated level of Tau protein in brain tissue.[8]

31.     CTE can be caused by a single traumatic brain injury, but is much more often the result of repeated minor traumas. According to an NIH study, "[t]here is overwhelming evidence that the condition is the result of repeated sublethal brain trauma that often occurs well before the development of clinical manifestations."[9]

32.     As dangerous as individual concussions and sub-concussive blows can be in the short term, the long-term effects are more debilitating and insidious. Because CTE is difficult to detect, manifests years later, and includes chronic mental issues, many sufferers do not understand their illness. Whereas a concussion's symptoms are often sensory and manifest

---

[8] Bennet I. Omalu et al., "Chronic Traumatic Encephalopathy, Suicides and Parasuicides in Professional American Athletes," 31 AM. J. FORENSIC MED. PATHOLOGY 130, 132 (2010).
[9] Ann C. McKee et al., "Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy following Repetitive Head Injury," J. NEUROPATHOL EXP NEUROL. 2009 July; 68(7): 709–735.

immediately, CTE manifests years later, and can be caused by blows which have no accompanying symptoms.

33.     Many sufferers of CTE spend years with no idea—and no way of knowing—that they suffer from this disorder.

34.     Depression—including depression caused by CTE—is destructive, often leading to substance abuse and suicide. If caused by a physical trauma that happened years ago, with no reason or warning to suspect the true cause, these symptoms can be bewildering as well as debilitating.

35.      Research into the effects on professional athletes shows grim disparities based on head trauma: professional football players who had at least three concussive incidents over their careers were three times more likely to be diagnosed with clinical depression and five times more likely to be diagnosed with dementia than were players who had limited history of concussions.[10]

36.     As discussed below, at least one former WWE wrestler's autopsy revealed he suffered from CTE.

## III.    WWE Created a Culture of Violence and Sacrificed Plaintiffs' Brains for Its Own Profit

37.     During WWE matches, wrestlers perform activities that are exceedingly dangerous to themselves and to their adversaries. They are particularly dangerous when performers make mistakes in executing the stunts.

38.     For wrestlers directed to perform complicated and dangerous stunts day after day, such mistakes are not only inevitable, but frequent. This is so because (a) wrestlers are not

---

[10] Kevin M. Guskiewicz et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," 39 MED. & SCI. SPORTS & EXERCISE 903, 906 (2007).

properly trained to execute their "moves" in a safe—or at least, safer—manner; and (b) wrestlers have a grueling schedule, meaning they are often tired during their matches and more prone to inflict and suffer traumatic injury.

39.     It is commonplace for WWE wrestlers to experience numerous concussions over their careers, during which many fight hundreds of times each year.  As one former WWE wrestler, who suffered numerous concussions while working for WWE, noted, "as much as wrestling is performance, there's a very, very small margin of error. And especially when you're learning the thing, you fall on your head a lot."[11]

40.     Even where no mistakes occur, these stunts can result in detrimental blows to the head. Over the span of a career, these blows greatly increase the chance of CTE and related illnesses.

41.     WWE adds so-called "heat" to its scripts in order to ensure that there is "extra physicality" in its matches. In her testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives, WWE executive Stephanie McMahon Levesque defined "heat" as "when you are really beating someone down in order to elicit a reaction from the crowd of, 'Oh, my God, please get up, get up, get up,' and the guy can't."[12]  She provided an example of "heat," stating:

> For example, if there are a number of guys in the ring, like say there is five guys attacking one guy, and I am a good guy going to come out, if I come out by myself, I am going to get beat down just as bad as the other guy. But if I come out with a chair, I might have a better chance. Logically, so that is how the chairs are

---

[11] Michael Kirk, "League of Denial: the NFL's Concussion Crisis" (June 12, 2013), available at http://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/the-frontline-interview-chris-nowinski/.

[12] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 119 (Dec. 14, 2007), available at http://oversight-archive.waxman.house.gov/documents/20081231140942.pdf.

used. You might have seen -- or I don't know if you have seen any of our scripts -- but there might be chair shots written in at some point.[13]

42.     To elicit "heat" in events, WWE directs its wrestlers to use various weapons.  As Ms. Levesque's testimony suggests, WWE instructs its wrestlers to use metal chairs to batter each other.  In countless WWE matches, fighters have slammed chairs over the heads of their opponents.  Even where WWE wrestlers use chairs or other dangerous weapons without WWE's explicit direction, they do so with WWE's encouragement and tacit approval.  In many instances, these chair shots have delivered dangerous levels of force to the recipient's skull.

43.     The chair shot itself, though supposedly banned in 2010, is an iconic image of concussion-causing destruction which WWE utilizes to its fullest in advertisements and promotions. [14]  Even Paul Levesque, a WWE executive and son-in-law to Vincent K. McMahon, has used chair shots since 2010 in performances, as a wrestler under the name "Triple H."[15]

44.     WWE's announcers commonly revel in the ability of wrestlers to fight through injuries, downplaying concussions as mere "wooziness."

45.     These beatings, though nominally "fake," greatly increase the chance of wrestler injuries, particularly when a wrestler administering the "heat" commits an error. But even where no error is committed, the "heat" administered by wrestlers results in blows to the head.

46.     Some of these moves involve acrobatic feats that involve lifting opponents more than six feet in the air.

---

[13] *Id*. at 120.

[14] *See* Geno Mrosko, "WWE uses unprotected chair shot to the head to promote its Network" (July 12, 2014), available at http://www.cagesideseats.com/wwe/2014/7/12/5893661/wwe-uses-unprotected-chair-shot-to-the-head-to-promote-its-network.

[15] David Bixenspan, "After Wrestlemania, it looks like WWE has unbanned chair shots to the head" (Apr. 4, 2011), available at http://www.cagesideseats.com/2011/4/4/2090779/after-wrestlemania-it-looks-like-wwe-had-unbanned-chairs-to-the-head.

47.     During WWE practice and WWE matches, Plaintiffs sustained thousands of hits to the head.

48.     Instead of stopping events when Plaintiffs sustained injuries, WWE allowed such events to continue, requiring that Plaintiffs fight through the pain, and subjecting them to the long-term consequences of cumulative brain injury.

49.     Even the most basic wrestling move, the "bump," involves the risk of injury to the head and spine.  A bump involves falling to the mat backwards so the wrestler lands on his back. Wrestlers are taught to fall so that the top of their back hits the mat, and to avoid hitting their heads.  However, depending on the speed at which they are taking the bump, wrestlers hit their heads or necks resulting in head injuries.

50.     Over time, these blows greatly increase the chance of CTE.

## IV.  WWE Was Aware of the Dangers to Plaintiffs, and Covered It Up

### A.     Through Medical Literature, WWE Knew or Should Have Known the Risks Associated with its Activities

51.     WWE knew or should have known of the growing body of scientific evidence and its conclusions that persons who sustain repetitive concussive events, sub-concussive events and/or other brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities whether during their wrestling careers, or especially, later in life.

52.     WWE was and is aware of the risks of repeated head trauma and multiple concussive events caused by wrestling in their matches.  In 2007, a WWE executive admitted that "WWE wrestlers are at risk for concussions because of the nature of their work."

53.     For decades, WWE has known, or should have known, that wrestlers have been subjected to extremely dangerous conditions and blows at its direction.[17] And it therefore should have, but never did, warn its wrestlers of the risks associated with wrestling withWWE.

54.     The risks associated with sports in which athletes suffer concussive and sub-concussive blows have been known for decades. Below is a selection of mounting medical literature concerning head trauma:

i     During the 1950s, 60s, 70, 80s and 90s, studies were authored by the Journal of the American Medical Association ("JAMA") and the New England Journal of Medicine, concerning head trauma and concussions. In particular, many of the studies focused on sports-related head trauma and concussions and the long term implications of such injuries (which include loss of brain function and dementia).

i     In 1973, Drs. Corsellis, Bruton, & Freeman-Browne reported as to the physical neurological impact of boxing. The study outlined the neuropathological characteristics of dementia, loss of brain cells and cerebral atrophy.

i     In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines (updated in 2001).

i     In 2001 and 2004, conventions of neurological experts met in Prague and Vienna with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt,

---

[17] *See* http://concussioninc.net/?p=3286

sit them out." These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

i   A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

i   In 2007, scientists concluded that a former WWE wrestler had suffered from CTE. Scientists concluded in 2009 that a second former WWE wrestler had suffered from the same affliction.

55.     WWE knew, or should have known, about this and other research demonstrating the dangers of receiving concussive and sub-concussive blows to the head.  Moreover, WWE knew or should have known that the research associated with boxing, hockey, and football also reflected dangers associated with WWE wrestling. Indeed, for the reasons set forth above, wrestlers have a greater risk of receiving frequent concussive and sub-concussive blows to the head than athletes in those sports.

**B.     WWE has Attempted to Cover Up the Dangers of Head Trauma Associated with Wrestling.**

56.     WWE has engaged in a campaign of misinformation and deception to prevent Plaintiffs from understanding the true nature and consequences of the injuries they have sustained.

57.     WWE concealed important medical information, including the effects of multiple head traumas, and prematurely allowed Plaintiffs to return to the ring, even when injured. As a result, wrestlers, including Plaintiffs, suffered serious permanent and debilitating injuries and damages.

58.     WWE has continually represented to Plaintiffs , and the public, that the safety of its wrestlers is a top priority. To take but one example, Vincent K. McMahon told the Committee on Oversight and Government Reform of the U.S. House of Representatives, "Let me just say, [WWE] is always concerned about safety of our talent, absolutely. We were the first people to do any number of things to make things safe for our talent, if that's the direction in which you're going."[18]

59.     The NFL had created the Mild Traumatic Brain Injury Committee in 1994.  The NHL introduced a Concussion Policy in 1997 requiring NHL team doctors to document all concussions and collected data on standardized injury report forms.  In 1997, the NHL began baseline testing for its players and required team doctors and trainers to maintain records of all players believed to have concussions.  Yet WWE waited nearly a decade before adopting similar policies.

60.     Indeed, WWE has systematically denied that its wrestlers routinely suffer from concussions, or that its wrestlers suffer from long term brain damage.  No one at WWE ever warned Plaintiffs about the risk of sustaining numerous sub-concussive and concussive blows.

61.     For example, in 2007, WWE Executive Stephanie McMahon Levesque testified to the Committee on Oversight and Government Reform of the U.S. House of Representatives that there were no documented concussions in WWE's history. [19]

---

[18] Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of Vince Kennedy McMahon (Dec. 14, 2007), available at https://www.scribd.com/doc/33253381/Vince-McMahon-s-Testimony-to-Waxman-committee.

[19] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 117 available at http://oversight-archive.waxman.house.gov/documents/20081231140942.pdf.

62.     At the time of Levesque's testimony, WWE wrestlers likely had cumulatively experienced hundreds—if not thousands—of concussions. To categorically deny that these concussions were documented amounts to an admission that WWE refused to acknowledge the extreme risks it was subjecting its wrestlers to.

63.     Dr. Bennett Omalu, who pioneered the research into CTE, studied the brain tissue of a deceased NFL player named Mike Webster and published his findings in *Neurosurgery* in July 2005.  A month previously, Terry Long, a 45 year old Pittsburgh Steelers player committed suicide.  Dr Omalu opined that the cause may have been brain damage in line with his studies.

64.     In a pattern that echoes that of the NFL's original response to the discovery of CTE, WWE attempted to discredit these studies.

65.     Dr. Joseph Maroon, NFL Pittsburgh Steelers team doctor for twenty-five years and now WWE's chief doctor, attacked this conclusion.  Dr. Maroon reportedly told the Pittsburgh Post-Gazette that Dr. Omalu's conclusion that NFL Player Terry Long's suicide may have been the result of depression caused by head injuries during his career in football was "fallacious reasoning." Dr. Maroon stated "to go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative. . ."

66.     WWE  responded on ESPN, stating, "[w]hile this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for [professional wrestlers] Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85-year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is

required to perform in the ring…WWE has been asking to see the research and tests results in the case of Mr. Benoit for years and has not been supplied with them."[20]

67.      WWE's request to examine the research and tests was feigned, as Dr. Omalu reported that "Dr. Maroon was there with us and he was shown all our research information, slides, and specimens- on Chris Benoit and all the athletes' brains we studied."[21]

68.      In November of 2006, Dr. Omalu published a second paper after finding CTE in the brain of former Steelers' player Terry Long. He linked Webster and Long's career to the brain damage: "Our first and second cases both had long careers without multiple recorded concussions. Both manifested Major Depressive Disorder after retirement."

69.      He further commented to ESPN after studying WWE former wrestler Andrew Martin's brain: "People wondered if Mike Webster was an isolated event . . . and then came Terry Long and Andre Waters. When we announced our findings about Chris [Benoit], some in the media said it was 'roid rage. We said at the time the real finding was that repeated head trauma was the cause. With Andrew Martin as the second case, the WWE and the sport in general have to ask themselves, 'Is this a trend?' The science tells us that jumping off 10-foot ladders and slamming people with tables and chairs is simply bad for the brain."[22]

70.      In a joint interview for the 2007 CNN documentary *Death Grip: Inside Pro Wrestling*, WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon attacked Dr. Omalu and Dr. Bailes's finding that Benoit had suffered from CTE. This was part of a larger plan to deny that Benoit had suffered from CTE and to discredit the research suggesting he had.

---

[20] *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, *last accessed* February 13, 2015.
[21] Irwin, Muchnick, Concussion, Inc., p. 67 (ECW Press, 2015).
[22] *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, *last accessed* February 13, 2015.

71.     The NFL engaged in a protracted debate about the mounting evidence linking head trauma to CTE and the severe, long-term resulting injuries.  After attempting to discredit the research of doctors examining brain tissue of deceased NFL players, the NFL acknowledged its mistake in July of 2010 and began noticing players that concussions "may lead to problems with memory and communication, personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever."

72.     WWE created its "Wellness Program" in 2006, and selected Dr. Maroon as its architect, despite his involvement in efforts to discredit Dr. Omalu's research. An attorney for WWE has been publicly credited with establishing the "medical-testing program to protect wrestlers' health."[23]  That attorney has stated that the untimely death of popular wrestler Eddie Guerrero in November of 2005 "was the catalyst to the program that [WWE] now ha[s] in place."[24] That attorney retained by WWE recommended that WWE employ Dr. Joseph Maroon to set the program up.[25]

73.     WWE's chief doctor, Dr. Joseph Maroon, has been involved in prior concussion and head trauma related cover ups, including attempts to discredit research related to CTE.[26]

74.     The WWE Wellness policy advised; "WWE implemented its Talent Wellness Program on February 27, 2006… Since its implementation the Wellness Program has been refined and expanded to cover: Comprehensive Medical and Wellness Staffing, Cardiovascular

---

[23] Deitch, "Heavyweight Champions." Pittsburgh City Paper (December 2, 2010) *available at* http://www.pghcitypaper.com/gyrobase/Content?oid=oid%3A88609
[24] *Id.*
[25] *Id.*
[26] *See* http://concussioninc.net/?p=9617

Testing and Monitoring, ImPACT testing, Substance Abuse and Drug Testing, Annual Physicals, Health Care Referrals."[27]

75.    The Wellness Program uses a concussion diagnostic system which a "study of studies" in 2012 revealed may increase the risk of long term damage because of its error rate.[28]

76.    The Wellness Program also reaches out to former wrestlers to offer support for drug and alcohol abuse, but these contacts do not adequately advise former wrestlers, including Plaintiffs, about head injuries.

77.    WWE has stated that it has "the finest monitoring program in American Sports," thereby admitting the undertaking by WWE to monitor its wrestler's health and safety, and establishing its duty to provide full and accurate information to its wrestlers.

78.    WWE's Wellness Program served to deceive Plaintiffs by providing a false sense of security and assurance that their health and safety were being adequately monitored, both in the ring and as former wrestlers.  The Wellness Program, by purporting to protect Plaintiffs, merely prevented them from seeking adequate treatment or otherwise protecting their health.

79.    By concealing known risks and downplaying the injuries suffered during matches, and by prematurely clearing wrestlers who needed recuperation time, WWE denied Plaintiffs the opportunity to recover from head injuries, to seek appropriate medical treatment, and to monitor themselves for long term brain damage.

80.    In reliance on misleading statements issued by WWE, Plaintiffs have failed to take actions which otherwise could have mitigated their injuries, both during and after their wrestling careers.

---

[27] *See* Corporate WWE.com, http://corporate.wwe.com/wellness/talent-wellness-summary, *last accessed* February 13, 2015.

[28] *See* http://m.espn.go.com/general/story?storyId=8297794&src=desktop&wjb .

**V.     WWE Had a Duty to Plaintiffs and Breached That Duty**

81.     WWE, as organizer and purveyor of professional wrestling in which head trauma is a regular and repeated occurrence, had a duty to act in the best interest of its wrestlers' health and safety – including to keep wrestlers informed of the neurological risks associated with head injuries suffered while wrestling for WWE.  WWE had superior knowledge and access to information, and should have disclosed that information to Plaintiffs and not concealed such information.

82.     By virtue of its employment of medical staff and provision of treatment, WWE assumed a duty to conduct itself reasonably and to provide these services with reasonable care.  WWE hired medical personnel whose purpose was to monitor and assess the wrestlers inside and outside of the ring.  Plaintiffs reasonably relied on these medical personnel in determining whether they should return to the ring and continue fighting or had suffered serious injury necessitating further medical treatment.

83.     WWE's doctors and medical personnel failed to properly monitor, diagnose, and treat Plaintiffs before, during, and after the wrestling matches, in some cases allowing them to return to the ring despite "wooziness"—a sign of brain trauma.

84.     WWE undertakes to train wrestlers, and therefore has a duty to do so with reasonable care.  In fact, the training provided was inadequate and unreasonable, causing Plaintiffs harm.

85.     Upon information and belief, WWE regularly collects wrestler injury reports, becoming a repository of substantial concussion and other head injury information and conducting exclusive analysis.  Plaintiffs, lacking this information, had to rely on WWE to inform them of their health and safety information relating to their wrestling careers with WWE.

86.     By issuing statements and engaging in programs to address Plaintiffs' health, WWE had a duty to ensure that these statements were not misleading or fraudulent.  Instead, WWE provided information to Plaintiffs, who reasonably relied to their detriment.

87.     Contrary to its assertions concerning safety, WWE demanded Plaintiffs perform acts which it knew or should have known cannot be performed safely.  For example, the use of dangerous weapons like steel chairs by wrestlers cannot be done safely.

## VI.   Facts Concerning the Named Plaintiffs

### A.     Plaintiff Singleton

88.     Plaintiff Evan Singleton began wrestling for WWE in 2012 after graduating high school. He wrestled for WWE from 2012 to 2013 under the stage name "Adam Mercer." At the age of 19, he was among of the youngest professional wrestlers in WWE history.

89.     As a wrestler for WWE, Plaintiff suffered numerous injuries to the upper body, neck and headr. As a new wrestler he was often matched in training with inexperienced opponents which, due to their lack of experience, resulted in more injuries.

90.     One of Singleton's trainers was former wrestler Bill Demott.

91.     Bill Demott resigned from WWE on March 6, 2015 amid widespread allegations of misconduct and abuse.[29] Specifically, Demott was accused of making trainees perform dangerous drills, assaulting students, and subjecting them to intense verbal abuse.

---

[29] Marissa Payne, "WWE trainer Bill DeMott resigns amid allegations of racist, homophobic and abusive behavior", Washington Post.com (March 6, 2015), http://www.washingtonpost.com/blogs/early-lead/wp/2015/03/06/wwe-trainer-bill-demott-resigns-amid-allegations-of-racist-homophobic-and-abusive-behavior/, *last accessed* May 19, 2015.

92.     In 2012, Plaintiff Singleton was "choke slammed," that is, lifted by the throat and thrown to the ground. As a result, he suffered a blow to the left side of his head causing neurological damage.  He lost consciousness and was pinned after the injury.

93.     WWE's trainer advised his roommate to "keep an eye on him over the weekend" after this incident.  It was not until a month later that Singleton saw a doctor who, after administering the "ImPact" test, recommended rest.

94.     He returned to practice several months later.  He was pressured by Demott and other WWE employees to return to the ring despite not being cleared to wrestle.  Indeed, throughout his recovery, he received near-daily phone calls from WWE employees threatening and harassing him about his failure to return.  He was accused of malingering and threatened with the loss of employment.

95.     Throughout this period, Plaintiff Singleton suffered from dizziness and depression.

96.     It was not until more than 10 months later that he was diagnosed with a traumatic brain injury, including an intracranial hemorrhage.

97.     Mr. Singleton now suffers from post-concussion symptoms including but not limited to headaches, severe migraines, memory loss, behavioral changes, amnesia, involuntary twitching, inability to concentrate, panic attacks, and severe depression.

98.     Mr. Singleton scored a Migraine Disability Assessment Test (MIDAS) grade of IV "severe disability."  The MIDAS is a test used by doctors to determine how severely migraines affect a patient's life.

99.     At the age of 22, he is nearly fully disabled and cannot perform simple tasks like driving a car.

**B.  Plaintiff LoGrasso**

100.   Plaintiff Vito LoGrasso, 50 years old, wrestled for WWE from 1991 to 1998 and from 2005 to 2007.  Plaintiff LoGrasso wrestled under many names including "Big Vito" and "Vito."

101.   As a wrestler for WWE, LoGrasso was repeatedly forced to put his body—and his head—in harm's way.  LoGrasso participated in numerous matches where he suffered sub-concussive or concussive blows, yet WWE officials and medical staff did not intervene or take measures to prevent further injury. Indeed, WWE did not provide or recommend LoGrasso seek adequate medical care, even when he was showing unmistakable signs of serious injury.

102.   Over the course of his career, LoGrasso was coerced into wrestling while seriously and obviously injured countless times.  LoGrasso worked in a WWE developmental facility with trainer Bill Demott, who routinely coerced wrestlers to perform while injured and disregarded their health and safety during training.

103.   LoGrasso, at various times, was punched, battered with chairs, metal garbage cans, baseball bats, and was thrown through objects, including tables.  Many of these blows were to the head.

104.   WWE never warned LoGrasso about the risk of sustaining numerous sub-concussive and concussive blows, nor has it provided him any guidance to this day.

105.   As a direct result of his participation in WWE events, LoGrasso suffers from post concussion syndrome including serious neurological damage, symptoms of which include severe headaches, memory loss, depression and anxiety for which he is seeing a psychiatrist. He also suffers from deafness.

## ESTOPPEL FROM PLEADING AND TOLLING OF
## APPLICABLE STATUTES OF LIMITATION

106.     Plaintiffs reasonably relied on WWE's statements to inform them about safety and health. As a direct result of statements and conduct (*i.e.* omissions) outlined above, Plaintiffs were lulled into inaction by WWE.

107.     Plaintiffs reasonably acted on what WWE omitted – that concussions and sub-concussive hits are serious and result in permanent disability and brain trauma, and that returning to wrestling before being properly evaluated, treated and cleared to wrestle could result in enormous risks of permanent damage, especially in returning to wrestle immediately after taking brutal hits to the head.

108.     WWE was obligated to disclose, but failed to disclose,  vital information to Plaintiffs based upon its special relationship with its wrestlers, assumed duty of care, voluntary undertaking of the Wellness Program, and superior knowledge about the causes, frequency, severity and proper treatment of concussions, mild traumatic brain injuries and other sub-concussive injuries and head trauma.  WWE affirmatively concealed facts, and continues to conceal facts, which prevented Plaintiffs from discovering their claims.

109.     To the extent that it is applicable, the statute of limitations is tolled because of Defendants' fraudulent concealment of the dangers and adverse effects of head injuries, the risks associated with wrestling, the injuries suffered while wrestling, and the negligent medical care provided to Plaintiffs through WWE.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (FRAUDULENT CONCEALMENT)

110.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

111.     Defendant knowingly, fraudulently, and actively misrepresented, omitted, and concealed from Plaintiffs material facts concerning repetitive head impacts and related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long-term neurological damage.

112.     WWE knowingly and fraudulently concealed from WWE wrestlers and former WWE wrestlers the risks of head injuries, in particular the heightened risk created by returning to the ring before making a proper recovery from their head injuries.

113.     WWE has voluntarily and repeatedly made material representations to its WWE wrestlers, former WWE wrestlers, and the public at large that there was no evidence linking, or insufficient evidence linking, multiple concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms.

114.     WWE concealed material facts and information with the intent to deceive and defraud.  WWE's conduct left Plaintiffs without the necessary knowledge to make informed decisions to plan for the future of themselves and their families and to seek appropriate treatment for their latent neurodegenerative condition during their lives.

115.     WWE knew that Plaintiffs would rely on the inaccurate information provided by WWE.

116.     Plaintiffs relied on this inaccurate information during and after their careers with WWE.

117.     Defendant had a duty to disclose and warn Plaintiffs about the actual knowledge it maintained about such injuries and the true nature of the risks posed to wrestlers.

118.     Plaintiffs reasonably and actually relied upon Defendant's representations, omissions and concealments. Such reliance may also be imputed, based upon the materiality of Defendant's wrongful conduct.

119.     As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiffs have been damaged, as alleged herein.

## SECOND CAUSE OF ACTION
## (FRAUD BY OMMISSION / FAILURE TO WARN)

120.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs as if specifically pled herein.

121.     WWE had a duty to promptly disclose and speak the full truth regarding the health risks caused by concussions and sub-concussive blows to the head.  This duty arose because WWE had superior special knowledge of material medical information that WWE wrestlers did not have access to, nor was readily available to them, WWE communicated with WWE wrestlers and the public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE, resulting in incomplete, partial, or ambiguous—and therefore misleading— statements regarding safety and head injuries.

122.     WWE breached that duty by fraudulently failing to disclose material information to Plaintiffs regarding the risks of head injuries suffered due to WWE's activities, including, the link between concussions and brain injury, resulting negative effects and cognition-impairing conditions, and their increased risk of CTE, the need for additional diagnostic testing, and the increased risk of other irreversible brain damage and neuro-cognitive impairment.

123.     Plaintiffs justifiably relied on WWE's fraudulent omissions to their detriment.

124.    Had Plaintiffs been aware of such information they would have ensured that they received appropriate medical treatment and ensured that they were completely healthy and their brains had completely healed before returning to the ring.

125.    As a direct and proximate result of WWE's fraud by omission and failure to warn, Plaintiffs suffered serious injuries, including but not limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

## THIRD CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)

126.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

127.    WWE negligently and/or recklessly misrepresented, omitted, and concealed from Plaintiffs material facts concerning repetitive head impacts and related injuries.

128.    WWE materially misrepresented the risks faced by Plaintiffs related to head, back, and spine injuries through misleading public statements, requiring Plaintiffs to fight through the pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

129.    WWE negligently failed to disclose material information to its wrestlers regarding the link between head injuries suffered while wrestling for WWE and the resulting negative effects and cognition-impairing conditions.

130.    WWE actively omitted true information at a time when it knew, or should have known, because of its superior position of knowledge, that Plaintiffs faced serious health problems if they returned to the ring too soon after sustaining a concussion.

131.    WWE and/or the WWE's "Talent Wellness Program," had no reasonable ground for believing  its statements to be true.

132.    WWE intended to induce Plaintiffs' reliance on these misrepresentations.

26

133.   Plaintiffs justifiably and reasonably relied on WWE's negligent misrepresentations to their detriment when wrestling for WWE, relying on what WWE said and failed to say to WWE wrestlers about concussions and other head injuries.

134.   Plaintiffs acted and failed to act in reliance on these statement to their detriment.

135.   WWE failed to act with reasonable care by negligently failing to disclose material information to Plaintiffs regarding the link between concussions and brain injury and the resulting negative effects and cognition-impairing conditions.

136.   Defendant had a duty to disclose to Plaintiffs any actual knowledge is possessed conceding such injuries and any associated risks it was aware of.

137.   As a direct and proximate result of these misrepresentations, omissions, and concealments, Plaintiffs have been damaged, as alleged herein.

138.   As a direct and proximate result of WWE's negligent misrepresentations, Plaintiffs have suffered and continue to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, and emotional distress. Plaintiffs seek the full measure of damages allowed under applicable law.

139.   Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud, and/or malice entitling Plaintiffs to an award of punitive damages to the extent allowed in an amount appropriate to punish or to set an example of Defendant so as to deter future similar conduct on the part of Defendant and others.

**FOURTH CAUSE OF ACTION**
**(FRAUDULENT DECEIT)**

140.   Plaintiffs re-allege and incorporate by reference the foregoing paragraphs as if specifically pled herein.

141.   WWE materially misrepresented the risks faced by Plaintiffs related to head injuries.  WWE, through misleading and deceptive public statements and published articles, downplayed known long-term health risks of concussions to Plaintiffs.

142.   WWE made these misrepresentations and actively concealed adverse information at a time when it knew, or should have known, that Plaintiffs faced serious health problems if they were forced to return to the ring too soon after suffering brain trauma.

143.   WWE intended to induce Plaintiffs' reliance on the misrepresentations and to induce them to alter their positions related to injury and risk.

144.   Plaintiffs justifiably and reasonably relied on these misrepresentations when wrestling for WWE.  Had they known the true risks to their health, they would have acted to protect their health.

145.   WWE's misrepresentations were substantial factors leading to Plaintiffs' injuries.

146.   As a direct and proximate result of WWE's misrepresentations, Plaintiffs experienced pain and suffering and suffered serious permanent and debilitating injuries, including but not limited to neurological damage and CTE, which caused and/or contributed to his untimely death, as well as emotional distress, pain and suffering, and economic and non-economic damages.

### FIFTH CAUSE OF ACTION
### (NEGLIGENCE)

147.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

148.   WWE has a duty to Plaintiffs, based in part on voluntarily assumptions of duties, regarding safety and head trauma.

149.   Yet, as previously outlined throughout this Complaint, WWE has failed to discharge this duty non-negligently.

150.    WWE had and continues to have a duty to exercise reasonable care in training, techniques, medical advice, prescription requirements, and medical monitoring and diagnosing of injuries such as concussions and sub-concussions during performances.

151.    Defendant owed a duty to Plaintiffs to exercise reasonable care in the safety and quality control of its wrestling matches.

152.    Defendant was aware, or reasonably should have been aware, that concussion injuries were prevalent in its events and posed great risk to its wrestlers.

153.    As a direct and proximate result of the Defendant's negligent acts and omissions as previously stated, Plaintiffs suffered traumatic brain damage from sustained concussions, sub-concussions, and CTE, and have an increased risk of further concussions and sub-concussions, an increased severity of concussions and sub-concussions, disfiguring scarring and physical injury, loss of mental acuity and acumen, loss of short-term memory, loss of awareness, depression, loss of a healthier state of being, as well as other symptoms and disorders resulting from their severe injuries.

154.    As a direct and proximate cause of the foregoing, Plaintiffs have suffered and will continue to suffer damages and economic loss described fully above, in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(MEDICAL MONITORING)**

155.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

156.    Repetitive blows to the head during WWE events have a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein.

Among other things, the gradual build-up of Tau protein – sometimes over decades – causes CTE and related disorders.

157.   The effects of WWE's negligence and the circumstances it subjected wrestlers to may lead to latent physical changes which ultimately cause significant neurological impairment.

158.   Wrestling exposed Plaintiffs to hazardous conditions and out-of-the ordinary risks of harm. Repetitive head traumas to which the Plaintiffs have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiffs' exposure to the risks of harm as described above would have been materially lower.

159.   Accordingly, the repetitive head impacts sustained by wrestlers exposed Plaintiffs to subtle and repetitive changes within the brain on the cellular level. For that reason, the environment within which Plaintiffs have sustained repetitive head impacts exposed them to substantive hazards.

160.   Plaintiffs suffered latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and related disorders. These are present injuries that increase the risk of future harm.

161.   WWE wrestlers were and continue to be:

a.   Exposed to greater than normal background levels;

b.   Of a proven hazardous substance, condition, activity, or event;

c.   Which was caused by the Defendant's willful, wanton, reckless or negligent acts; and,

d.    As a proximate result of the exposure, Plaintiffs have significantly increased risk of contracting serious latent diseases.

e.    Further, a monitoring procedure exists that makes the early detection of the disease possible; and,

f.    Such a monitoring regime is different from that normally recommended in the absence of the exposure or activities at issue here;

g.    All of which is reasonably necessary according to contemporary scientific principles.

162.   By monitoring and testing the affected brains and bodies of the Plaintiffs, it can be determined whether they have suffered the injuries alleged herein.

163.   By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long term injuries, disease, and losses will be significantly reduced.

164.   By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long term injuries, disease, and losses without adequate treatment will be significantly reduced.

165.   The medical monitoring regime must include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with WWE wrestling. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiffs suffered as a result of participating in WWE events.

166.   Accordingly, Defendant should be required to establish a medical monitoring program that, among other things:

    a.    Establishes a trust fund, in an amount to be determined, to pay for the medical monitoring of Plaintiffs, as frequently as determined to be medically necessary, as well as to pay to develop and research other methods by which the risk of those affected can be reduced;and

    b.    Provides information to treating physicians to aid them in detecting such injuries.

    167.   Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of concussions and repeated sub-concussive blows. Without a Court-approved medical monitoring program as described herein, Plaintiffs will continue to face unreasonable risks alleged herein.

    168.   Plaintiffs are entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

    WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.    Compensatory and punitive damages;

2.    Costs;

3.    Interest as allowed by law and,

4.    For such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

    Plaintiffs demand a jury trial on all issues so triable.

DATE:      May 22, 2015

                    By:_ /s/ William M. Bloss

                    William M. Bloss
                    Federal Bar No: CT01008

Koskoff, Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT  06604
Telephone: 203-336-4421
Facsimile: 203-368-3244


Charles J. LaDuca
Brendan Thompson
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
charles@cuneolaw.com
brendant@cuneolaw.com

Robert K. Shelquist
Scott Moriarity
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Ave., S., Suite 2200
Minneapolis, MN 55401-2179
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
samoriarity@locklaw.com

Konstantine W. Kyros
KYROS LAW OFFICES
17 Miles Rd.
Hingham, MA 02043
Telephone: (800) 934-2921
Facsimile: 617-583-1905
kon@kyroslaw.com

Erica Mirabella
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: 617-580-8270
Facsimile: 617-580-8270
Erica@mirabellaLLC.com

*Attorneys for Plaintiffs*

**CERTIFICATION**

I hereby certify that on this date a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ William M. Bloss
William M. Bloss