UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**EVAN SINGLETON and**
**VITO LOGRASSO**

                    **Plaintiffs,**

**v.**

**WORLD WRESTLING**
**ENTERTAINMENT, INC.,**

                    **Defendants.**

**CIVIL ACTION NO.**

**3:15-cv-00425-VLB**

**June 15, 2015**

### PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Evan Singleton and Vito LoGrasso ("Plaintiffs") allege the following upon personal knowledge as to their own experiences, transactions and upon information and belief as to all other matters.

### INTRODUCTION

1.     This lawsuit concerns World Wrestling Entertainment, Inc.'s ("WWE")[1] negligent and fraudulent mistreatment of the Plaintiffs who sustained long-term occupational post-concussion injuries as professional wrestlers.  The Plaintiffs allege the WWE's concealment, omission, and denial of medical information pertaining to traumatic brain injuries has caused their harm, tolls the statute of limitations and violates a continuous duty that the WWE owes and has voluntarily undertaken to these Plaintiffs.

---

[1] "World Wrestling Entertainment, Inc." and "WWE", as used in this Complaint, refer to the company in its current incarnation, along with all predecessor companies, including, but not limited to, Titan Sports, Inc., World Wrestling Federation, Inc., and World Wrestling Federation Entertainment, Inc.

2.     Plaintiffs have developed symptoms and been diagnosed with permanent, degenerative post-concussion brain injuries from their wrestling performances with WWE.  Additionally, Plaintiffs believe they are at greater risk for developing long-term brain diseases such as dementia, Alzheimer's disease, ALS, and CTE. Plaintiffs believe they are substantially more likely than the general population to develop such diseases in the future as a result of WWE's misconduct.

3.     WWE has known  or  should  have  known for  decades that  repeated concussive and  sub-concussive  impacts  substantially  increase  the  probability that  a wrestler  will  develop  a  permanent,  degenerative  brain disease. The plaintiffs argue the WWE's knowledge of these injuries stem from the large body of medical and scientific studies that date as far back to the 1920's that link head trauma   to   long   term neurological   problems. The   WWE   chose   to hide this necessary information from the Plaintiffs to preserve the huge profits made from the violent culture created by the WWE.

4.     WWE took affirmative steps to mislead Plaintiffs into wrestling while injured, resulting in the accumulation of concussive and sub-concussive impacts without sufficient recuperation time.  The accumulation of head trauma is exponentially more dangerous than isolated blows, a fact WWE knew or should have known.  Yet, WWE failed to take adequate steps to prevent, or even disclose the risk of, these successive injuries.

5.     WWE's representations, actions, and inactions have caused Plaintiffs to suffer long-term debilitating injuries, lost income, premature retirement, medical expenses, and other losses as alleged herein.

6.      WWE failed to disclose in a timely manner the true risks of repeated head impacts in WWE wrestling, and failed to take appropriate steps to prevent and mitigate repeated traumatic head impacts (including sub-concussive blows and concussions) and latent brain injury.  Indeed, by refusing to acknowledge the risks it was creating – and by attempting to conceal those risks from its wrestlers – WWE effectively guaranteed that they would not seek the help they needed to avoid latent brain injury.

7.      When forced to acknowledge the risks to which it subjects its wrestlers – by script, on a daily basis – WWE took inadequate steps to correct the problem or to address its injurious conduct, the full consequences of which are still coming to light.  Indeed, WWE continues a course of conduct designed to mislead Plaintiffs about the injuries they have sustained by failing to disclose pertinent facts or offering misleading half-truths.

8.      The Plaintiffs had a special relationship with the WWE.  Not only did they rely on the WWE to script and direct the wrestling performances in a safe manner, the Plaintiffs also relied on WWE to communicate medical and safety information to them.  When the WWE communicated medical and safety information to the Plaintiffs the WWE had superior information about the long-term risks of repeated head trauma and had an ongoing duty to disclose accurate information to the Plaintiffs.  According to the Plaintiffs the WWE breached its duty to disclose accurate information to them during and after their wrestling careers, specifically the WWE breached its duty by negligently omitting material information regarding the link between the type of head injuries sustained in the WWE and cognition

3

impairing conditions.  The Plaintiffs with only high school educations justifiably and reasonably relied to their detriment on these negligent representations by omission.

9.     WWE's medical personnel are subject to the standards of the profession at the time that the medical care was provided.  Concussion research during the years Plaintiffs wrestled for WWE was such that the WWE had actual notice of the causal connection between head trauma suffered while wrestling for WWE and long-term neurological injury.  Plaintiffs would not reasonably be expected to research medical literature during their employment with WWE, nor would they be expected to know the sophisticated medical jargon and language of the medical profession.  Plaintiffs reasonably relied on WWE's superior knowledge and position of authority, evidenced by the special relationship between Plaintiffs and WWE, which resulted in Plaintiffs' reliance to their detriment on WWE's fraudulent concealment and omissions regarding Plaintiffs' health and safety.

10.     Plaintiffs seek a declaration of liability, injunctive relief, medical monitoring, and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by the Plaintiffs as a result of WWE's conduct, which resulted in Plaintiffs suffering brain trauma, concussions, and other related injuries.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs are residents of a different state from Defendant and because the value of the matter in controversy exceeds $75,000.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

13.    **Plaintiff Evan Singleton is a citizen of Pennsylvania.  He wrestled for WWE under the name Adam Mercer from 2012 to 2013.**

14.    **Plaintiff Vito LoGrasso is a citizen of Pennsylvania.  He wrestled with WWE from 1991 to 1998 and from 2005 to 2007.**

15.    **Defendant World Wrestling Entertainment, Inc. is a company existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut and it conducts business in this jurisdiction.**

16.    **Although WWE is a public company, it is controlled by a small group of related executives who manage both polices and the conduct of wrestlers during matches. Vincent K. McMahon has been Chairman of WWE since the retirement of his father, Vincent McMahon Sr., in 1980. Vincent K. McMahon has served as CEO from 1980 to 1993, and from 2009 to the present.  McMahon controls over 80 percent of WWE's voting power. McMahon's wife, Linda McMahon, served as WWE President from 1993 to 2009, and as CEO from 1997 to 2009. Their daughter, Stephanie McMahon Levesque, is WWE's Chief Brand Officer. Her husband, Paul Levesque is Executive Vice President, Talent, Live Events & Creative.**

## FACTUAL ALLEGATIONS

I.    **Background: WWE and Its Wrestlers**

17.    **WWE is the largest wrestling entertainment organization in the world. Since purchasing its main competitor, World Championship Wrestling, in 2001, WWE has had no serious competitors in the field of wrestling entertainment. The company generates approximately $500 million in revenue annually.**

5

18.     The majority of WWE's revenues stem from its televised wrestling events. WWE programs consistently rank among the most popular in weekly television ratings. WWE programming is broadcast in more than 170 countries and 35 languages and reaches more than 650 million homes worldwide.

19.     For nearly three decades, WWE has been the world's pre-eminent provider of pay-per-view programming, consistently ranking among the highest-selling live event programs in the world.

20.     WWE calls itself an "action soap opera."[2]  Its events are scripted, with preordained winners and losers, and it has a carefully written, ongoing plot. WWE predetermines much of the dialogue between the wrestlers and the winners of the events, as well as many of the violent acts perpetrated by the wrestlers on each other.

21.     Many WWE wrestlers fight hundreds of times per year. And unlike professional athletes in traditional sports leagues, WWE wrestlers have no off-season in which to rest and recover from their injuries.

22.     Despite WWE's enormous revenues, WWE does not provide its wrestlers, past or current, with health insurance, disability insurance, or unemployment insurance. Wrestlers are effectively on their own.

23.     WWE scripts events and matches, including some moves.  The trainers, bookers, and other WWE employees, organize and oversee the action that takes place in each performance, effectuating WWE's scripts.

---

[2] Examiner.com, "WWE to be called an 'action soap opera' not pro-wresting, Bans more terms" (Apr. 13, 2011), available at http://www.examiner.com/article/wwe-to-be-called-an-action-soap-opera-not-pro-wrestling-bans-more-terms.

24.     Throughout the history of WWE, wrestlers, including Plaintiffs, look to and rely on their trainers, bookers, and WWE staff, both to provide specific direction from WWE, and to ensure their safety during performances.

II.     The Science of Head Trauma

25.     The primary classification of head injuries relevant to WWE are traumatic brain injuries ("TBIs," or colloquially, "concussions") and chronic traumatic encephalopathy ("CTE"). Concussions can cause CTE, but are not the only cause: repeated sub-concussive head trauma also causes CTE. Over their career, WWE wrestlers suffer repeated concussions and countless sub-concussive blows.

26.     Concussions have no standard definition, and require complex diagnosis based on clinical signs, observed symptoms, neuroimaging, medical records and personal interviews.[3] The Centers for Disease Control and Prevention ("CDC") define concussions as a type of TBI caused by a "bump, blow, or jolt to the head or body."[4] A blow to the head that does not cause a concussion, or that has not been diagnosed to cause a concussion, is commonly referred to as a sub-concussive blow.

---

[3] National Center for Injury Prevention and Control, "Report to Congress on Mild Traumatic Brain Injury in the United States: Steps to Prevent a Serious Health Problem" 1 (2003), available at http://www.cdc.gov/ncipc/pubres/mtbi/report.htm.

[4] Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), *available at* http://www.cdc.gov/concussion/signs_symptoms.html.

27.    Many concussions go undiagnosed and untreated. Though concussions are often associated with a loss of consciousness, the majority of concussions are not so obviously recognized.

28.    Even absent a loss of consciousness, each concussion alters the way the brain functions.   Symptoms can include headaches and problems with concentration, memory, balance coordination, loss of consciousness, confusion, disorientation, nausea, vomiting, fatigue or drowsiness, difficulty sleeping, sleeping more than usual, and seizures.[5]   Although concussion research continues to grow, WWE had actual notice of these symptoms during Plaintiffs wrestling careers as concussion research had already established these symptoms as evidencing concussions.[6]

29.    Post-concussion syndrome remains with a person for days, weeks or even months.  Indeed, while, "[s]ome of these symptoms may appear right away. . . others may not be noticed for days or months after the injury."[7] In some cases, concussions can cause bleeding in the brain, which can be fatal.[8]  This also has been evident to the medical community since Plaintiffs were employed by WWE,

---

[5] Mayo Clinic, "Post-Concussion Syndrome: Definition," (Aug. 19, 2014), *available at* http://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/basics/definition/con-20032705.

[6] Mayo Clinic, "Concussion: Signs and symptoms", (February 17, 2005), *available at* https://web.archive.org/web/20060816052646/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=2.

[7] Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), http://www.cdc.gov/concussion/signs_symptoms.html.

[8] Mayo Clinic, "Concussions: Causes" (Apr 2, 2014), available at http://www.mayoclinic.org/diseasesconditions/concussion/basics/causes/con-20019272.

providing WWE's medical personnel with the necessary information to diagnose and treat Plaintiffs' concussion and sub-concussive symptoms and injuries.[9]

30.     Repeated blows sustained without sufficient recovery time are exponentially more dangerous. Sometimes called "second impact syndrome," multiple blows can amplify the original injury. According to the Mayo Clinic, "[e]xperiencing a second concussion before signs and symptoms of a first concussion have resolved may result in rapid and usually fatal brain swelling." Even in 2005, the Mayo Clinic recognized "a violent blow to your head can cause your brain to slide forcefully against the inner wall of your skull…A concussion causes at least a temporary loss in brain function.  Although losing consciousness is a common sign of a concussion, it's possible to suffer a concussion without being completely knocked out."[10]

31.     The WWE and WWE's medical personnel were in a unique position to have the wealth of medical literature on concussion and sub-concussive injuries in their possession, and in fact, were responsible to have such information available to them in order to practice to the standards of the medical profession during the years Plaintiffs were wrestling.  Therefore, it can be imputed that WWE was knowledgeable about the likelihood head trauma would cause concussions and sub-concussive injuries and the resulting long-term neurological injuries, and

---

[9] Mayo Clinic, "Concussion: Signs and symptoms", (February 17, 2005), *available at* https://web.archive.org/web/20060816052646/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=2.

[10] Mayo Clinic, "Concussion: Causes", (February 17, 2005), *available at* https://web.archive.org/web/20060706220359/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=3.

had actual notice and knowledge as to the signs and symptoms associated with concussion and sub-concussive injuries when Plaintiffs were wrestling for the WWE.

32.     CTE is a disorder caused by neurodegeneration including cognitive and neuropsychiatric symptoms. Long-known as dementia pugilistica or punch-drunk syndrome, an increasing consensus has emerged that mild and infrequent trauma can cause similar long term neurological effects to those experienced by boxers.

33.     CTE is a permanent change to brain structure caused by repeated blows. CTE's accompanying symptoms include depression, dementia, cognitive impairment, Parkinsonism, personality change, speech and gait abnormalities. Unlike concussions, CTE can only be diagnosed with direct tissue examination, which can detect an elevated level of Tau protein in brain tissue.[11]

34.     CTE can be caused by a single traumatic brain injury, but is much more often the result of repeated minor traumas. According to an NIH study, "[t]here is overwhelming evidence that the condition is the result of repeated sublethal brain trauma that often occurs well before the development of clinical manifestations."[12]

35.     As dangerous as individual concussions and sub-concussive blows can be in the short term, the long-term effects are more debilitating and insidious.

[11] Bennet I. Omalu et al., "Chronic Traumatic Encephalopathy, Suicides and Parasuicides in Professional American Athletes," 31 AM. J. FORENSIC MED. PATHOLOGY 130, 132 (2010).

[12] Ann C. McKee et al., "Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy following Repetitive Head Injury," J. NEUROPATHOL EXP NEUROL. 2009 July; 68(7): 709–735.

Because CTE is difficult to detect, manifests years later, and includes chronic mental issues, many sufferers do not understand their illness. Whereas a concussion's symptoms are often sensory and manifest immediately, CTE manifests years later, and can be caused by blows which have no accompanying symptoms.

36.    Many sufferers of CTE spend years with no idea—and no way of knowing—that they suffer from this disorder.

37.    Depression—including depression caused by CTE—is destructive, often leading to substance abuse and suicide. If caused by a physical trauma that happened years ago, with no reason or warning to suspect the true cause, these symptoms can be bewildering as well as debilitating.

38.    Research into the effects on professional athletes shows grim disparities based on head trauma: professional football players who had at least three concussive incidents over their careers were three times more likely to be diagnosed with clinical depression and five times more likely to be diagnosed with dementia than were players who had limited history of concussions.[13]

39.    As discussed below, at least one former WWE wrestler's autopsy revealed he suffered from CTE.

  III.    WWE Created a Culture of Violence Putting Profits Over Plaintiffs' Safety

---

[13] Kevin M. Guskiewicz et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," 39 MED. & SCI. SPORTS & EXERCISE 903, 906 (2007)

40.     During WWE matches, wrestlers including Plaintiffs performed activities that are exceedingly dangerous to themselves and to their adversaries. They are particularly dangerous when performers make mistakes in executing the stunts.

41.     For wrestlers directed to perform complicated and dangerous stunts day after day, including Plaintiffs, such mistakes are not only inevitable, but frequent. This is so because (a) wrestlers are not properly trained to execute their "moves" in a safe—or at least, safer—manner; and (b) wrestlers have a grueling schedule, meaning they are often tired during their matches and more prone to inflict and suffer traumatic injury.

42.     It is commonplace for WWE wrestlers to experience numerous concussions over their careers, during which many fight hundreds of times each year.  A wrestler such as Plaintiff LoGrasso, wrestling on average five times a week, sustained repeated concussions day after day over many years, resulting in a greatly increased chance of CTE and related illnesses.

43.     Even where no mistakes occur, these stunts can result in detrimental blows to the head. Over the span of a career, these blows greatly increase the chance of CTE and related illnesses.

44.     WWE intentionally and willfully adds what it calls "heat" to its scripts in order to ensure that there is "extra physicality" in its matches. In her testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives in 2007, WWE executive Stephanie McMahon Levesque defined "heat" as "when you are really beating someone down in order to elicit a reaction

12

from the crowd of, 'Oh, my God, please get up, get up, get up,' and the guy can't."[14]  She provided an example of "heat," stating:

> For example, if there are a number of guys in the ring, like say there is five guys attacking one guy, and I am a good guy going to come out, if I come out by myself, I am going to get beat down just as bad as the other guy. But if I come out with a chair, I might have a better chance. Logically, so that is how the chairs are used. You might have seen -- or I don't know if you have seen any of our scripts -- but there might be chair shots written in at some point.[15]

45.    To elicit "heat" in events, WWE directs its wrestlers to use various weapons.  As Ms. Levesque's testimony suggests, WWE instructs its wrestlers to use metal chairs to batter each other.  In countless WWE matches, fighters have slammed chairs over the heads of their opponents.  Even where WWE wrestlers use chairs or other dangerous weapons without WWE's explicit direction, they do so with WWE's encouragement and tacit approval.  In many instances, these chair shots have delivered dangerous levels of force to the recipient's skull including to Plaintiffs.

46.    The chair shot itself, though supposedly banned in 2010, is an iconic image of concussion-causing destruction which WWE utilizes to its fullest in

---

[14] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 119 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.
[15] *Id.* at 120.

advertisements and promotions.[16]  Even Paul Levesque, a WWE executive and son-in-law to Vincent K. McMahon, has used chair shots since 2010 in performances, as a wrestler under the name "Triple H."[17]

47.    WWE's announcers commonly revel in the ability of wrestlers to fight through injuries, downplaying concussions as mere "wooziness."

48.    These beatings, though nominally "fake," greatly increase the chance of wrestler injuries, particularly when a wrestler administering the "heat" commits an error. But even where no error is committed, the "heat" administered by wrestlers results in blows to the head.

49.    Some of these moves involve acrobatic feats that involve lifting opponents more than six feet in the air.

50.    During WWE practice and WWE matches, Plaintiffs sustained thousands of hits to their heads as part of scripted and choreographed moves.

51.    Instead of stopping events when Plaintiffs sustained injuries, WWE allowed such events to continue, requiring that Plaintiffs fight through the pain, and subjecting them to the long-term consequences of cumulative brain injury.

52.    Even the most basic wrestling move, the "bump," involves the risk of injury to the head and spine.  A bump involves falling to the mat backwards so the

---

[16] See Geno Mrosko, "WWE uses unprotected chair shot to the head to promote its Network" (July 12, 2014), available at http://www.cagesideseats.com/wwe/2014/7/12/5893661/wwe-uses-unprotected-chair-shot-to-the-headto-promote-its-network.

[17] David Bixenspan, "After Wrestlemania, it looks like WWE has unbanned chair shots to the head" (Apr. 4, 2011), available at http://www.cagesideseats.com/2011/4/4/2090779/after-wrestlemania-it-looks-like-wwe-had-unbannedchairs-to-the-head.

wrestler lands on his back. Wrestlers are taught to and are directed by WWE to fall so that the top of their back hits the mat, and to avoid hitting their heads. However, depending on the speed at which they are taking the bump, wrestlers hit their heads or necks resulting in head injuries.  Plaintiffs conducted this move multiple times over their careers.

53.     Over time, these blows greatly increase the chance of CTE.

IV.     **WWE Was Aware of and Covered Up the Dangers to Plaintiffs**

    A. **Through Medical Literature, WWE Knew or Should Have Known the Risks Associated With Its Activities**

54.     As previously alleged, WWE knew or should have known during Plaintiffs' WWE careers of the growing body of scientific evidence and its conclusions that persons such as Plaintiffs who sustain repetitive concussive events, sub-concussive events and/or other brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities whether during their wrestling careers, or especially, later in life.

55.     WWE was and is aware of the risks of repeated head trauma and multiple concussive events caused by wrestling in their matches.  In 2007, a WWE executive admitted that "WWE wrestlers are at risk for concussions because of the nature of their work."  And yet, WWE continues to understate the risks and dangers of CTE, as evidenced by Dr. Joseph Maroon's statements to the NFL Network, Total Access in March 2015, "The problem of CTE, although real, is its

being over-exaggerated".[18]   WWE and its medical personnel use their unique positions of authority and superior knowledge to quell their wrestlers', including Plaintiffs', fears regarding injuries and convince them it is safe to continue wrestling through concealment of necessary information, omission of pertinent medical information, and failures to properly assess, diagnose, and treat their wrestlers', including Plaintiffs' injuries, leading to Plaintiffs reliance to their detriment on WWE's allowance of Plaintiffs continuing to wrestle and perform after suffering symptoms of concussions and sub-concussive injuries and being allowed and encouraged to fight through the pain and continue wrestling despite having suffered concussions and sub-concussive injuries.

56.   For decades spanning back to the 1920s WWE has known, or should have known, that wrestlers have been subjected to extremely dangerous conditions and blows at its direction.[19] Specifically, WWE was aware in 2005 and beyond that wrestling for the WWE and suffering head trauma would result in long-term injuries.[20]  And it therefore should have, but never did, warn Plaintiffs of the risks of concussions and other brain injuries associated with wrestling with WWE.

57.   The risks associated with sports in which athletes suffer concussive and sub-concussive blows have been known for decades to the medical community. Below is a selection of mounting medical literature concerning head trauma:

---

[18] NFL Network, NFL Total Access, "Dr. Maroon: The NFL Has Never Been Safer", (March 2015), *available at* http://www.nfl.com/videos/nfl-network-total-access/0ap3000000479597/Dr-Maroon-The-NFL-has-never-been-safer
[19] *See* http://concussioninc.net/?p=3286
[20] *See* Mayo Clinic, "Concussions: Causes", (February 17, 2005), *available at* https://web.archive.org/web/20060706220359/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=3.

- **During the 1950s, 60s, 70, 80s and 90s, studies were authored by the Journal of the American Medical Association ("JAMA") and the New England Journal of Medicine, concerning head trauma and concussions. In particular, many of the studies focused on sports-related head trauma and concussions and the long term implications of such injuries (which include loss of brain function and dementia).**

- **In 1973, Drs. Corsellis, Bruton, & Freeman-Browne reported as to the physical neurological impact of boxing. The study outlined the neuropathological characteristics of dementia, loss of brain cells and cerebral atrophy.**

- **In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines (updated in 2001).**

- **In 2001 and 2004, conventions of neurological experts met in Prague and Vienna with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out." These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.**

- **A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado**

17

Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

- In 2007, scientists concluded that a former WWE wrestler had suffered from CTE. Scientists concluded in 2009 that a second former WWE wrestler had suffered from the same affliction.

58.   WWE knew, or should have known, about this and other research demonstrating the dangers of receiving concussive and sub-concussive blows to the head.   Moreover, WWE knew or should have known that the research associated with boxing, hockey, and football also reflected dangers associated with WWE wrestling. Indeed, for the reasons set forth above, wrestlers have a greater risk of receiving frequent concussive and sub-concussive blows to the head than athletes in those sports.

**WWE Has Attempted to Cover Up the Dangers of
Head Trauma Associated with Wrestling**

59.   WWE has engaged in a campaign of misinformation and deception to prevent Plaintiffs from understanding the true nature and consequences of the injuries they have sustained.

60.   WWE concealed important medical information, including the effects of multiple head traumas, and prematurely allowed Plaintiffs to return to the ring or to practice, even when injured. As a result, wrestlers, including Plaintiffs, suffered serious permanent and debilitating injuries and damages.

61.   WWE has continually represented directly to Plaintiffs, and indirectly to them through the public, that the safety of its wrestlers is a top priority. To take but one example, Vincent K. McMahon told the Committee on Oversight and

18

Government Reform of the U.S. House of Representatives, "Let me just say, [WWE] is always concerned about safety of our talent, absolutely. We were the first people to do any number of things to make things safe for our talent, if that's the direction in which you're going."[21]

62.    The NFL had created the Mild Traumatic Brain Injury Committee in 1994. The NHL introduced a Concussion Policy in 1997 requiring NHL team doctors to document all concussions and collected data on standardized injury report forms.  In 1997, the NHL began baseline testing for its players and required team doctors and trainers to maintain records of all players believed to have concussions.  Yet WWE waited nearly a decade before adopting similar policies.

63.    Indeed, WWE has systematically denied to Plaintiffs and their co-wrestlers that its wrestlers routinely suffer from concussions, or that its wrestlers suffer from long term brain damage.  No one at WWE ever warned Plaintiffs about the risk of sustaining numerous sub-concussive and concussive blows.

64.    For example, in 2007, WWE Executive Stephanie McMahon Levesque testified to the Committee on Oversight and Government Reform of the U.S. House of Representatives that there were no documented concussions in WWE's history.[22]

---

[21] Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of Vince Kennedy McMahon (Dec. 14, 2007), available at https://www.scribd.com/doc/33253381/Vince-McMahons-Testimony-to-Waxman-committee.

[22] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 117 available at http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.

65.    At the time of Levesque's testimony, WWE wrestlers likely had cumulatively experienced hundreds—if not thousands—of concussions. To deny that these concussions were documented amounts to an admission that WWE refused to acknowledge the extreme risks it was subjecting its wrestlers to.

66.    Dr. Bennett Omalu, who pioneered the research into CTE, studied the brain tissue of a deceased NFL player named Mike Webster and published his findings in Neurosurgery in July 2005.  A month previously, Terry Long, a 45 year old Pittsburgh Steelers player committed suicide.  Dr Omalu opined that the cause may have been brain damage in line with his studies.

67.    In a pattern that echoes that of the NFL's original response to the discovery of CTE, WWE attempted to discredit these studies.

68.    Dr. Joseph Maroon, NFL Pittsburgh Steelers team doctor for twenty-five years and now WWE's chief doctor, attacked this conclusion.  Dr. Maroon reportedly told the Pittsburgh Post-Gazette that Dr. Omalu's conclusion that NFL Player Terry Long's suicide may have been the result of depression caused by head injuries during his career in football was "fallacious reasoning." Dr. Maroon stated "to go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative…"

69.    WWE responded on ESPN, stating, "[w]hile this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for [professional wrestlers] Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been

able to remember all the moves and information that is required to perform in the ring…WWE has been asking to see the research and tests results in the case of Mr. Benoit for years and has not been supplied with them."[23]

70.    WWE's request to examine the research and tests was feigned, as Dr. Omalu reported that "Dr. Maroon was there with us and he was shown all our research information, slides, and specimens- on Chris Benoit and all the athletes' brains we studied."[24]

71.    In November of 2006, Dr. Omalu published a second paper after finding CTE in the brain of former Steelers' player Terry Long. He linked Webster and Long's career to the brain damage: "Our first and second cases both had long careers without multiple recorded concussions. Both manifested Major Depressive Disorder after retirement."

72.    He further commented to ESPN after studying WWE former wrestler Andrew Martin's brain: "People wondered if Mike Webster was an isolated event . . . and then came Terry Long and Andre Waters. When we announced our findings about Chris [Benoit], some in the media said it was 'roid rage. We said at the time the real finding was that repeated head trauma was the cause. With Andrew Martin as the second case, the WWE and the sport in general have to ask themselves, 'Is this a trend?' The science tells us that jumping off 10-foot ladders and slamming people with tables and chairs is simply bad for the brain."[25]

---

[23] *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.
[24] Irwin, Muchnick, Concussion, Inc., p. 67 (ECW Press, 2015).
[25] See ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.

73.    In a joint interview for the 2007 CNN documentary Death Grip: Inside Pro Wrestling, WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon attacked Dr. Omalu and Dr. Bailes's finding that Benoit had suffered from CTE. This was part of a larger plan to deny that Benoit had suffered from CTE and to discredit the research suggesting he had.

74.    The NFL engaged in a protracted debate about the mounting evidence linking head trauma to CTE and the severe, long-term resulting injuries.  After attempting to discredit the research of doctors examining brain tissue of deceased NFL players, the NFL acknowledged its mistake in July of 2010 and began noticing players that concussions "may lead to problems with memory and communication, personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever."

75.    Through its actions of failing to properly assess, diagnose, and treat wrestlers such as Plaintiffs who suffered concussion and sub-concussive injuries during their scripted performances and who showed clear signs of concussion, sub-concussive injury and CTE symptoms, evidence WWE's refusal and ongoing, continued refusal to properly inform and provide necessary medical care to the Plaintiffs throughout their WWE careers despite this wealth of information uniquely at WWE's disposal.

76.    WWE created its "Wellness Program" in 2006, and selected Dr. Maroon as its architect, despite his involvement in public efforts to discredit Dr. Omalu's research. An attorney for WWE has been publicly credited with establishing the

"medical-testing program to protect wrestlers' health."[26]  That attorney has stated that the untimely death of popular wrestler Eddie Guerrero in November of 2005 "was the catalyst to the program that [WWE] now ha[s] in place."[27] That attorney retained by WWE recommended that WWE employ Dr. Joseph Maroon to set the program up.[28]

77.    WWE's chief doctor, Dr. Joseph Maroon, has been involved in prior concussion and head trauma related cover ups, including attempts to discredit research related to CTE.[29]

78.    The WWE Wellness policy advised; "WWE implemented its Talent Wellness Program on February 27, 2006… Since its implementation the Wellness Program has been refined and expanded to cover: Comprehensive Medical and Wellness Staffing, Cardiovascular Testing and Monitoring, ImPACT testing, Substance Abuse and Drug Testing, Annual Physicals, Health Care Referrals."[30]

79.    The Wellness Program uses a concussion diagnostic system which a "study of studies" in 2012 revealed may increase the risk of long term damage because of its error rate.[31]

---

[26] Deitch, "Heavyweight Champions." Pittsburgh City Paper (December 2, 2010) available at http://www.pghcitypaper.com/gyrobase/Content?oid=oid%3A88609.
[27] *Id.*
[28] *Id.*
[29] *See* http://concussioninc.net/?p=9617.
[30] *See* Corporate WWE.com, http://corporate.wwe.com/wellness/talent-wellness-summary, last accessed February 13, 2015.
[31] *See* http://m.espn.go.com/general/story?storyId=8297794&src=desktop&wjb.

80. The Wellness Program also reaches out to former wrestlers to offer support for drug and alcohol abuse, but these contacts fail to advise former wrestlers, including Plaintiffs, about head injuries.

81. WWE has stated that it has "the finest monitoring program in American Sports," thereby admitting the undertaking by WWE to monitor its wrestler's health and safety, and establishing its duty to provide full and accurate information to its wrestlers.

82. WWE's Wellness Program served to deceive Plaintiffs by providing a false sense of security and assurance that their health and safety were being adequately monitored, both in the ring and as former wrestlers. The Wellness Program, by purporting to protect Plaintiffs, merely led them into not seeking adequate treatment or otherwise protecting their health.

83. By concealing known risks and downplaying the injuries suffered during matches, and by prematurely clearing wrestlers who needed recuperation time, WWE denied Plaintiffs the opportunity to recover from head injuries, to seek appropriate medical treatment, and to monitor themselves for long term brain damage.

84. In reliance on both misleading statements issued by WWE attempting to downplay the severity of concussion and sub-concussive injuries, as well as WWE's actions in failing to properly assess, diagnose, and treat concussion and sub-concussive injuries, Plaintiffs have failed to take actions which otherwise could have mitigated their injuries, both during and after their wrestling careers.

V.     WWE Had a Duty to Plaintiffs and Breached That Duty

85.    WWE, as organizer and purveyor of professional wrestling in which head trauma is a regular and repeated occurrence, had a duty to act in the best interest of its wrestlers' health and safety – including to keep wrestlers informed of the neurological risks associated with head injuries suffered while wrestling for WWE.  WWE had superior knowledge and access to information, and should have disclosed that information to Plaintiffs and not concealed such information.

86.    By virtue of its employment of medical staff and provision of treatment to Plaintiffs, WWE assumed a duty to conduct itself reasonably and to provide these services with reasonable care. WWE hired medical personnel whose stated purpose was to monitor and assess the wrestlers inside and outside of the ring. Plaintiffs reasonably relied on these medical personnel in determining whether they should return to the ring and continue fighting or practicing or had suffered serious injury necessitating further medical treatment.

87.    WWE's doctors and medical personnel failed to properly monitor, diagnose, and treat Plaintiffs before, during, and after the wrestling matches, in some cases allowing them to return to the ring despite "wooziness"—a sign of brain trauma.

88.    WWE undertakes to train all wrestlers including those against whom Plaintiffs wrestled, and therefore WWE had a duty to do so with reasonable care. In fact, the training provided was inadequate and unreasonable, causing Plaintiffs harm.

89.    Upon information and belief, WWE regularly collected and continues to collect wrestler injury reports, including during Plaintiffs' careers with WWE,

becoming a repository of substantial concussion and other head injury information and conducting exclusive analysis. Plaintiffs, lacking this information, had to rely on WWE to inform them of their health and safety information relating to their wrestling careers with WWE.

90. By issuing statements and engaging in programs to address Plaintiffs' health, WWE had a duty to ensure that these statements were complete and were not misleading or fraudulent. Instead, WWE provided incomplete information to Plaintiffs, who reasonably relied on it to their detriment.

91. Contrary to its assertions concerning safety, WWE demanded Plaintiffs perform acts which it knew or should have known cannot be performed safely. For example, the use of dangerous weapons like steel chairs against the head by wrestlers cannot be done safely.

92. Upon information and belief, WWE has as recently as 2015 implemented the use of helmets during training at WWE training facilities. Helmets had previously not been worn by wrestlers at the WWE training facilities and were not worn by the Plaintiffs when they trained and wrestled with WWE.



**Captured from embedded video on WWE's WWE Tough Enough Facebook page,**

***available at***

**https://www.facebook.com/WWEtoughenough/videos/vb.181273445231240/10120**

**37205488189/?type=2&theater, posted on June 11, 2015.**

**VI.      Facts Concerning the Named Plaintiffs**

    **A.  Plaintiff Evan Singleton**

**93.      Plaintiff Evan Singleton who stands at 6 feet, 6 inches and 330 pounds, is a resident of Pennsylvania. Mr. Singleton has a high school education and attempted to "break in" to the wrestling world immediately after high school. Plaintiff signed with WWE in 2012 and wrestled for WWE from 2012 to 2013.  His stage name was "Adam Mercer." At the age of 19, he was among of the youngest professional wrestlers in WWE history.**

**94.      He states that WWE contract was provided on a "take it or leave it basis," and he did not have a lawyer to advise him of the contract terms nor did he negotiate any of the contracts he was told to sign.**

95.     During his time wrestling for WWE, Plaintiff often wrestled several times per week and did not have adequate time to rest between matches and was encouraged to wrestle while injured. As a wrestler for WWE, Plaintiff suffered numerous injuries to the upper body, neck and head during his career.

96.     As a new wrestler he was often matched in training with inexperienced opponents which due to lack of experience resulted in more injuries. He characterized his role as being that of a "crash test dummy."

97.     One of Singleton's trainers was former wrestler Bill Demott. After the events alleged by Mr. Singleton herein, Bill Demott resigned from the WWE on March 6, 2015 amid widespread allegations of misconduct and abuse.[32] Several former wrestlers working within the WWE Developmental system of which plaintiff Evan Singleton was a part, have made public allegations of misconduct against Mr. Demott during his tenure as a WWE trainer.

98.     Specifically Mr. Demott was accused of making trainees perform dangerous drills. Austin Matelson whose ring name was Judas Devlin states he sent a letter to WWE Talent Relations in March 2013. In the letter posted online,[33] Matelson alleges a brutal culture fostered by Demott in which Demott physically assaulted students, used racial and sexually insulting names and forced them

---

[32] Marissa Payne, "WWE trainer Bill DeMott resigns amid allegations of racist, homophobic and abusive behavior", Washington Post.com (March 6, 2015), http://www.washingtonpost.com/blogs/early-lead/wp/2015/03/06/wwetrainer-bill-demott-resigns-amid-allegations-of-racist-homophobic-and-abusive-behavior/, last accessed May 19, 2015.

[33] Reddit.com, Squared Circle Sub-reddit, "Bullying/NEGLECT in WWE/NXT & Medical Staff; MUST READ & MUST HEAR Interview w/Former NXT Star!", (March 2015), *available at* https://www.reddit.com/r/SquaredCircle/comments/2xphrq/bullyingneglect_in_wwenxt_medical_staff_must_read/.

into dangerous drills that led to many injuries. Matelson allegedly suffered injuries during his training under Demott.

99.    Singleton alleges that Mr. Demott was one of the WWE staff that acted negligently in both his training and liaison with WWE medical staff.

100.    Specifically Mr. Singleton alleges he had only performed a choke slam once about five minutes previous to being told during a house show on or about September 27, 2012 in Tampa, Florida that he would be "choke slammed" as part of the conclusion of the performance. Mr. Singleton was knocked completely unconscious after being choke slammed by a more skilled, more experienced wrestler named Erick Rowan.

101.    Erick Rowan who stands at 6 feet 8 inches, 315 pounds is 33 year old wrestler with more than a decade of experience, having been a wrestler since 2003.

102.    A choke slam is considered by wrestlers themselves to be one of the more dangerous moves. The move involved grabbing Mr. Singleton by the neck, being lift up and slammed to the mat. Rowan lifted the Plaintiff by the throat/neck and slammed him to the mat. Singleton contends that he was thrown with extra force and was actually thrown to the mat.

103.    Mr. Singleton suffered a blow to the left side of his head and sustained a brain injury as a result. He passed out after the trauma and was pinned. He states he was "in a fog" and was able to walk back to the training room, he was having balance problems.

104.   Mr. Singleton was not treated immediately after the incident. He did see a trainer, who despite having believed Mr. Singleton sustained a concussion advised he rest over the weekend and was advised his roommate and dad "will keep an eye on him over weekend." During this time he was having daily headaches, dizziness, balance problems. His memory of the several months following the incident is poor.

105.   At some point, appears to be nearly one month (October 2, 2012) after the incident Singleton was finally seen by a Dr. Lovell, A WWE affiliated doctor in Pittsburg who administered an Impact test and recommended "rest." In subsequent reports Dr. Lovell seems to downplay the injury to Mr. Singleton.

106.   As Mr. Singleton's symptoms worsened he was finally seen by Dr. Amann who ordered an MRI on November 14, 2012 and by a neurologist Dr. Greenberg who ordered additional testing.

107.   On January 18, 2013 Singleton was "cleared by Dr. Greenberg to return to normal activity with no restrictions or limitations." On January 21, Singleton returned to watch practice where the notes indicate" "We will get a routine down to slowly integrate him into full practice within the next month." He was not medically cleared to wrestle, though he did "some in ring activity" on February 2, 2013 for 7 minutes, where he complained of dizziness and being "woozy." Mr. Demott and others allegedly encouraged him to return and criticized his inability to perform.

108.   During his convalescence and period following his injury, Singleton states that he received near daily phone calls from Bill Demott and another WWE

employee named Canyon Semen, threatening and harassing him to return to the ring leading up to the February 2 incident. In the dozens of calls placed by Demott to Singleton on his cell phone, Demott allegedly took issue with Singleton's inability to perform. Demott allegedly used abusive language, and curses in an apparent effort to coerce him to return to work.

109.   Singleton states these calls were very stressful, making him feel that he would be fired at any moment and contributed to his poor mental state.

110.   In February 2013 Singleton was seen by additional WWE Doctors including Dr. Amann who now diagnosed depression seemingly unrelated to his head injury.

111.   By July 2013 and EEG was performed and finally on August 30, 2013 did the WWE doctors conclude he may have had a traumatic brain injury.

112.   By November 2013 over one year after the incident, WWE doctors Maroon, Amann, Lovell finally advised Mr. Singleton be sent to an Inpatient traumatic Brain Injury facility.

113.   Upon information and belief, Plaintiff Singleton was diagnosed with a traumatic brain injury, including a possible intracranial hemorrhage.  Singleton's Primary Treating Physician Nancy Rogers-Neame in a letter to the WWE associated Doctor Christopher Amann dated February 3, 2014 which describing severe symptoms listed a "Chronic Conditions / Primary Diagnosis of Traumatic Brain Hem Nec -853." This diagnosis code is defined in the ICD as "unspecified intracranial hemorrhage following injury without mention of open intracranial wound." She writes "He presents for follow up of his condition following a

traumatic brain injury secondary to a "body slam" and subsequent intracranial hemorrhage".   Mr. Singleton now suffers from post-concussion symptoms including but not limited to headaches, severe migraines, memory loss, behavioral changes, amnesia, involuntary twitching, inability to concentrate, panic attacks, and severe depression.

114.   As a direct result of his participation in WWE events, Mr. Singleton has suffered physical changes placing him at a higher risk of future harm for neurological problems. Today Mr. Singleton suffers from post-concussion symptoms including but not limited to headaches, severe migraines, memory loss, and severe depression.

115.   He was further seen for psychiatric & emotional issues related to the brain injury by Dr. Darren Rothschild. Per medical records Mr. Singleton suffers from migraines, severe depression, behavioral changes, amnesia, involuntary twitching, inability to concentrate for more than 15 minutes, was not able to drive a car for years, was at risk for suicide, and needs long term mental health treatment. A WWE treating psychiatrist concluded his was "unfortunately a very difficult case."

116.   Additionally Mr. Singleton scored a Migraine Disability Assessment Test (MIDAS) grade of IV "severe disability". The MIDAS is a test used by doctors to determine how severely migraines affect a patient's life. The professional Journal Neurology found the test to be both reliable and valid.

117.   As a direct and proximate result of wrestling for the WWE, Plaintiff suffers from symptoms of severe and permanent brain damage. In fact Mr. Singleton at

the age of 22 now suffers from a permanent disability from his brief WWE career. He was diagnosed Dr. Nancy Rodgers-Neame, MD, who upon information and belief concluded Mr. Singleton is almost completely disabled, at the age of 22.

### B. Plaintiff Vito LoGrasso

118.    Plaintiff Vito LoGrasso, who fought under numerous ring names including Big Vito and Vito Cruz, began fighting for the WWE (then the WWF) in 1990 at the age of 25.  By 1991, Mr. LoGrasso's agent, Al Schaefer, alias Sunny Blaze, and Robert Remus, alias Sgt. Slaughter (who upon information and belief is currently employed in WWE's ambassador program), brought Mr. LoGrasso onto Monday Night Raw as an "extra".

119.    A prolific performer, Mr. LoGrasso would wrestle for the WWE up to five times a week.

120.    Agents such as Tony Garea and Renee Goulet, employees of the WWE, would call Mr. LoGrasso and tell him who we would fight and when the match would take place.  Howard Finkle, another agent for the WWE, would arrange Mr. LoGrasso's transportation and stays.

121.    Bookers were the creative for the performances and would write the scripts, deciding everything from what costumes the wrestlers should wear to who would win the match. Upon information and belief, even Vince McMahon himself participated in the writing of the scripts, which included the type and method of fighting engaged in by the wrestlers during the matches.

122.    Mr. LoGrasso was used whenever the WWE needed an extra fighter for a match and soon became a regular performer on the WWE networks.

123.   Mr. LoGrasso signed a full-time contract with the WWE in 2005 as an experienced wrestler whom could perform in wrestling games, bigger stages, and more choreographed matches set-up by the WWE bookers and agents.

124.   Mr. Lograsso was made to believe by WWE employees he could not admit he had been injured.  His trainers, including Bill Dumott, would continuously permeate an environment of humiliation and silence, encouraging the wrestlers to fight through serious injury which upon information and belief has led to Mr. LoGrasso's long-term and latent injuries.  Mr. LoGrasso attended the Deep South Championship Training Camp in Georgia, where Bill Dumott trained new recruits and current performers, and would force complaining injured wrestlers to sit in a corner as a form of "time-out" to prevent the wrestlers from admitting injury and to prevent the wrestlers from seeking and receiving necessary medical treatment.

125.   During his training and wrestling career with WWE, Mr. LoGrasso was told by WWE employees and at the time believed that injuries he suffered were part of "paying his dues", and believed that having "your bells rung", or receiving "black and blues" and bloody noses only resulted in the immediate pain and injury with no long-term ramifications or effects.

126.   Mr. LoGrasso had no reason to believe that suffering repeated injuries to his head, neck, and spine could result in long-term illnesses, diseases, and injuries and had no reason to believe that the injuries he was receiving while performing for the WWE would cause latent, long-term injuries.

127.   Mr. LoGrasso was never informed by the WWE that receiving head trauma could result in a concussion or sub-concussion.

128.   Mr. LoGrasso, even if he had been aware that receiving head trauma could result in a concussion or sub-concussion, would not have known that repeated concussions and sub-concussions would likely result in long-term, latent illnesses, diseases, and injuries.

129.   At the main television performances, usually Monday Night Raw and Pay-Per-View events, Dr. Rios, upon information and belief the primary doctor for in-ring events for the WWE until the end of 2006, was the primary contact for medical care and treatment for Mr. LoGrasso.  Dr. Rios would assess injuries and determine whether a performer required further medical care or could "just shower it off".  If Mr. LoGrasso was feeling "sluggish" Dr. Rios would provide Vitamin B-12 shots for increased performance.  Mr. LoGrasso relied on Dr. Rios' medical knowledge and information to properly assess, diagnose, and treat his injuries.

130.   Upon information and belief, Dr. Rios would on numerous occasions based upon his medical knowledge witness Mr. LoGrasso suffer head trauma extremely likely to cause concussions and sub-concussions and yet would not properly assess Mr. LoGrasso to determine his medical condition and would not provide necessary medical treatment, instead allowing Mr. LoGrasso to return to the ring before his head, neck, spine, and brain had been given the time necessary to heal from such sustained head trauma.  Mr. LoGrasso relied on Dr. Rios' assessments (or lack thereof) in his determination to return to the ring to fight after sustaining numerous and sustained blows to the head.

131.    Sports trainers hired by the WWE would be present at both television events and house matches.  These sports trainers would be equipped with sports tape, peroxide, and other equipment to aid in the wrestlers' performances.  These sports trainers would assess any injuries sustained at the matches and determine whether x-rays would be necessary in the event of a more serious injury.  The sports trainers would wrap sprains with sports tape and douse open wounds in peroxide.  Mr. LoGrasso relied on the sports trainers to properly assess his injuries and to prescribe the proper form of treatment necessary for a healthy recovery.

132.    Mr. LoGrasso reasonably relied on the WWE's medical personnel, trainers, agents, and documents when he continued to fight and receive sustained head trauma repeatedly over twenty years which resulted in repeated concussions and sub-concussions causing latent, neurological injuries only later beginning to manifest itself in severe headaches and neurological illness, which Mr. LoGrasso continues to suffer from.

133.    In 2006, Mr. LoGrasso went on a program with WWE performer Regal which choreographed storyline written by the WWE bookers and agents required Mr. LoGrasso to be overly beaten as a result of his cross-dressing gimmicks and persona, also created by the WWE.  As a result of the storylines and choreography designed and implemented by the WWE, Mr. LoGrasso was forced to endure and be beaten repeatedly and suffer sustained head trauma from Regal every match, causing Mr. LoGrasso to "have his bell rung" every match.  This

resulted in Mr. LoGrasso suffering symptoms of fogginess and requiring him to step away and shower to clear his head.

134.   In one of these matches with Regal in September, 2006, Mr. LoGrasso was kicked in the face outside the ring, knocking him to the ground where he struck his head against concrete steps.  Clearly having his "bell rung" from the impact, Mr. LoGrasso's ability to properly react to the beatings by Regal resulted in additional sustained head trauma without an ability to protect his head and so created a higher risk of sustaining concussions and sub-concussive injuries.

135.   Dr. Rios, or any other medical personnel employed by the WWE, never performed an adequate assessment on Mr. LoGrasso, never ordered any neurological testing, and never prescribed a hiatus from fighting to heal the repeated sustained head trauma highly likely to cause concussions and sub-concussions and which symptoms suffered by Mr. LoGrasso evidence the fact he received concussions and sub-concussions from such brutal and sustained beatings to the head designed and choreographed by the WWE.

136.   Mr. LoGrasso ended his long career with the WWE in 2007 after fighting in over one thousand matches, all similar to the above-described performances, having received no information on concussions and sub-concussions and being completely unaware of the connections between the head trauma sustained in the WWE with concussion and sub-concussive injuries.

137.   Mr. LoGrasso never knew that he could sustain a concussion while remaining awake.  He believed that even having his "bells rung" would not result in a concussion, and the medical personnel at the matches never corrected his

false belief or properly treated him when he inevitably did sustain concussions and sub-concussive injuries.

138.   Mr. LoGrasso was never educated about the ramifications of head trauma and injury and the likelihood of concussions and sub-concussions and the resulting latent neurological injuries suffered from sustaining concussions and sub-concussive injuries.

139.   Mr. LoGrasso never received any medical information regarding concussions or sub-concussive injuries while employed by the WWE.

140.   By 2008, Mr. LoGrasso was showing symptoms of neurological injury in the form of residual, pounding headaches.  At this time Mr. LoGrasso was not aware of any connection between the head trauma he had and continued to sustain in the WWE and the headaches, and so took aspirin to help with the pain and continued fighting.

141.   The severe results from the trauma sustained while fighting for the WWE continued to manifest itself through 2009 and 2010 when Mr. LoGrasso's headaches continued to worsen and become more frequent.  Mr. LoGrasso was diagnosed with TMJ of the jaw and was disabled near deaf in one ear and mostly deaf in the other.

142.   It was not until 2014 when Mr. LoGrasso's headaches became so unbearable that he saw Dr. Demarco, a primary care physician at Lancaster General Hospital's Urgent Care Facility, who sent him to Dr. Smith, an ENT Specialist who labeled Mr. LoGrasso disabled as deaf.

143.   On or around April 1, 2015, Mr. LoGrasso was diagnosed with traumatic brain injury, headache, and obstructive sleep apnea by Dr. Handler, a neurologist, after a CAT scan on Mr. LoGrasso's brain.

144.   On or around May 1, 2015, Dr. Robert Cavoto stated Mr. LoGrasso showed signs of post-concussion syndrome – cervical dysfunctia and T.M.J. as well as showing signs of depression.

145.   Additionally, Mr. LoGrasso sees a psychologist for depression, a recognized symptom of concussive syndrome, and continues to suffer recurring headaches.  As a result of the severity of the headaches and how much it has affected his daily living, he has been prescribed Amitriptyline in an attempt to relieve the headaches and help with sleep.

146.   Mr. LoGrasso is deaf, has suffered a severe impact to his quality of life, has to use hearing aids, suffers from TMJ, and traumatic brain injury (diagnosed on April 1, 2015).

147.   Mr. LoGrasso has been granted Medicaid and is labeled disabled by the State and is currently unemployed.

148.   Mr. LoGrasso continues to receive pamphlets and emails from the WWE from the WWE's Talent Wellness Program regarding the health and safety of retired WWE wrestlers.

### ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATION

149.   Plaintiffs reasonably relied on WWE's statements to inform them about safety and health. As a direct result of statements and conduct (and omissions) outlined above, Plaintiffs were lulled into inaction by WWE.

150.   Plaintiffs reasonably acted on what WWE omitted – that concussions and sub-concussive hits are serious and result in permanent disability and brain trauma, and that returning to wrestling before being properly evaluated, treated and cleared to wrestle could result in enormous risks of permanent damage, especially in returning to wrestle immediately after taking brutal hits to the head.

151.   WWE was obligated to disclose, but failed to disclose,  vital information to Plaintiffs based upon its special relationship with its wrestlers, assumed duty of care, voluntary undertaking of the Wellness Program, and superior knowledge about the causes, frequency, severity and proper treatment of concussions, mild traumatic brain injuries and other sub-concussive injuries and head trauma. WWE affirmatively concealed facts, and continues to conceal facts, which prevented Plaintiffs from discovering their claims.

152.   To the extent that it is applicable, the statute of limitations is tolled because of Defendants' fraudulent concealment of the dangers and adverse effects of head injuries, the risks associated with wrestling, the injuries suffered while wrestling, and the negligent medical care provided to Plaintiffs through WWE.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### EVAN SINGLETON V. WWE
### (FRAUDULENT CONCEALMENT)

153.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

154.   Defendant knowingly, fraudulently, and actively misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long-term neurological damage.

155.   WWE took affirmative actions to conceal the dangers of concussions, sub-concussive impacts, and head trauma, in particular the heightened risk created by returning to the ring before making a proper recovery from head injuries.

156.   WWE has voluntarily and repeatedly made material misrepresentations to its WWE wrestlers, former WWE wrestlers, including Plaintiff, and the public at large that there was no evidence linking, or insufficient evidence linking, multiple concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms.

157.   WWE concealed material facts and information with the intent to deceive and defraud.  WWE's conduct left Plaintiff without the necessary knowledge to make informed decisions to plan for his own future and his family and to seek appropriate treatment for his latent neurodegenerative condition during his life.

158.   WWE knew that Plaintiff would rely on the inaccurate information provided by WWE.

159.   Plaintiff relied on this inaccurate information during and after his career with WWE.

160.   Defendant had a duty to disclose and warn Plaintiff about the actual knowledge it maintained about such injuries and the true nature of the risks

41

posed to wrestlers.  Despite the overwhelming medical literature available to WWE agents and personnel tasked with promoting the health and safety of  WWE wrestlers and Plaintiff, WWE routinely failed to inform Plaintiff of the symptoms of concussions and the dangers of concussions and sub-concussive injuries, and the resulting long-term injuries.  In part resulting from WWE's culture of silence regarding head trauma and concussion and sub-concussive injuries, WWE failed to properly assess and diagnose concussions and sub-concussive injuries in their wrestlers, preventing Plaintiff from receiving necessary medical treatment and preventing Plaintiff from receiving necessary information to make an informed decision regarding his health and safety.

161.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

162.   WWE was silent when confronted with a duty to disclose such pertinent, material information, and the fact that some information is publicly available does not foreclose a finding of concealment.

163.   The Plaintiff reasonably and actually relied on Defendant's representations, omissions and concealments given WWE's knowledge and expertise, and given the special relationship existing between WWE and its wrestlers, such as Plaintiff. Such reliance may also be imputed, based upon the materiality of WWE's

wrongful conduct.  **Accordingly, the Plaintiff justifiably relied to his detriment on WWE's less than candid conduct and guidance, such conduct intended to deter Plaintiff's inquiry into the matter, in part by permeating a culture of silence with regard to injuries and head trauma.**

164.  **As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiff have been damaged, as alleged herein.**

### SECOND CAUSE OF ACTION
### VITO LOGRASSO V. WWE
### (FRAUDULENT CONCEALMENT)

165.  **Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.**

166.  **Defendant knowingly, fraudulently, and actively misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long-term neurological damage.**

167.  **WWE took affirmative actions to conceal the dangers of concussions, sub-concussive impacts, and head trauma, in particular the heightened risk created by returning to the ring before making a proper recovery from head injuries.**

168.  **WWE has voluntarily and repeatedly made material misrepresentations to its WWE wrestlers, former WWE wrestlers, including Plaintiff, and the public at large that there was no evidence linking, or insufficient evidence linking, multiple**

concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms.

169.    WWE concealed material facts and information with the intent to deceive and defraud.  WWE's conduct left Plaintiff without the necessary knowledge to make informed decisions to plan for his own future and his family and to seek appropriate treatment for his latent neurodegenerative condition during his life.

170.    WWE knew that Plaintiff would rely on the inaccurate information provided by WWE.

171.    Plaintiff relied on this inaccurate information during and after his career with WWE.

172.    Defendant had a duty to disclose and warn Plaintiff about the actual knowledge it maintained about such injuries and the true nature of the risks posed to wrestlers.  Despite the overwhelming medical literature available to WWE agents and personnel tasked with promoting the health and safety of  WWE wrestlers and Plaintiff, WWE routinely failed to inform Plaintiff of the symptoms of concussions and the dangers of concussions and sub-concussive injuries, and the resulting long-term injuries.  In part resulting from WWE's culture of silence regarding head trauma and concussion and sub-concussive injuries, WWE failed to properly assess and diagnose concussions and sub-concussive injuries in their wrestlers, preventing Plaintiff from receiving necessary medical treatment and preventing Plaintiff from receiving necessary information to make an informed decision regarding his health and safety.

173.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

174.   WWE was silent when confronted with a duty to disclose such pertinent, material information, and the fact that some information is publicly available does not foreclose a finding of concealment.

175.   The Plaintiff reasonably and actually relied on Defendant's representations, omissions and concealments given WWE's knowledge and expertise, and given the special relationship existing between WWE and its wrestlers, such as Plaintiff. Such reliance may also be imputed, based upon the materiality of WWE's wrongful conduct.  Accordingly, the Plaintiff justifiably relied to his detriment on WWE's less than candid conduct and guidance, such conduct intended to deter Plaintiff's inquiry into the matter, in part by permeating a culture of silence with regard to injuries and head trauma.

176.   As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiff have been damaged, as alleged herein.

### THIRD CAUSE OF ACTION
### EVAN SINGLETON V. WWE
### (FRAUD BY OMISSION / FAILURE TO WARN)

177.  Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

178.  WWE had a duty to Plaintiff to promptly disclose and speak the full truth regarding the health risks caused by concussions and sub-concussive blows to the head.  This duty arose because WWE had superior special knowledge of material medical information that WWE wrestlers did not have access to, nor was readily available to them, WWE communicated with WWE wrestlers and the public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE, resulting in incomplete, partial, or ambiguous—and therefore misleading— statements regarding safety and head injuries.

179.  WWE breached that duty by fraudulently failing to disclose material information to Plaintiff regarding the risks of head injuries suffered due to WWE's activities, including, the link between concussions and brain injury, resulting negative effects and cognition-impairing conditions, and their increased risk of CTE, the need for additional diagnostic testing, and the increased risk of other irreversible brain damage and neuro-cognitive impairment.

180.  Plaintiff justifiably relied on WWE's fraudulent omissions to their detriment.

181.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

182.   Had Plaintiff been aware of such information they would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and his brain had completely healed before returning to the ring.

183.   As a direct and proximate result of WWE's fraud by omission and failure to warn, Plaintiff suffered serious injuries, including but not limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

### FOURTH CAUSE OF ACTION
### VITO LOGRASSO V. WWE
### (FRAUD BY OMISSION / FAILURE TO WARN)

184.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

185.   WWE had a duty to Plaintiff to promptly disclose and speak the full truth regarding the health risks caused by concussions and sub-concussive blows to the head.  This duty arose because WWE had superior special knowledge of material medical information that WWE wrestlers did not have access to, nor was readily available to them, WWE communicated with WWE wrestlers and the

public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE, resulting in incomplete, partial, or ambiguous—and therefore misleading— statements regarding safety and head injuries.

186. WWE breached that duty by fraudulently failing to disclose material information to Plaintiff regarding the risks of head injuries suffered due to WWE's activities, including, the link between concussions and brain injury, resulting negative effects and cognition-impairing conditions, and their increased risk of CTE, the need for additional diagnostic testing, and the increased risk of other irreversible brain damage and neuro-cognitive impairment.

187. Plaintiff justifiably relied on WWE's fraudulent omissions to their detriment.

188. WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

189. Had Plaintiff been aware of such information he would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and his brain had completely healed before returning to the ring.

190. As a direct and proximate result of WWE's fraud by omission and failure to warn, Plaintiff suffered serious injuries, including but not limited to long-term

neurological damage, and the serious symptoms and disorders resulting from that damage.

**FIFTH CAUSE OF ACTION**
**EVAN SINGLETON V. WWE**
**(NEGLIGENT MISREPRESENTATION)**

191.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

192.   WWE negligently and/or recklessly misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and related injuries.

193.   WWE materially misrepresented the risks faced by Plaintiff related to head, back, and spine injuries through misleading public statements, requiring Plaintiff to fight through the pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

194.   WWE negligently failed to disclose material information to its wrestlers regarding the link between head injuries suffered while wrestling for WWE and the resulting negative effects and cognition-impairing conditions.

195.   WWE actively omitted true information at a time when it knew, or should have known, because of its superior position of knowledge, that Plaintiff faced serious health problems if they returned to the ring too soon after sustaining a concussion.

196.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

197.   WWE and/or the WWE's "Talent Wellness Program," had no reasonable ground for believing its statements to be true.

198.   WWE intended to induce Plaintiff's reliance on these misrepresentations.

199.   Plaintiff justifiably and reasonably relied on WWE's negligent misrepresentations to his detriment when wrestling for WWE, relying on what WWE said and failed to say to WWE wrestlers about concussions and other head injuries.

200.   Plaintiff acted and failed to act in reliance on these statements to his detriment.

201.   WWE failed to act with reasonable care by negligently failing to disclose material information to Plaintiff regarding the link between concussions and brain injury and the resulting negative effects and cognition-impairing conditions.

202.   Defendant had a duty to disclose to Plaintiff any actual knowledge is possessed conceding such injuries and any associated risks it was aware of.

203.   As a direct and proximate result of these misrepresentations, omissions, and concealments, Plaintiff has been damaged, as alleged herein.

204.   As a direct and proximate result of WWE's negligent misrepresentations, Plaintiff has suffered and continues to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, and emotional distress. Plaintiff seeks the full measure of damages allowed under applicable law.

205.   Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud, and/or malice entitling Plaintiff to an award of punitive damages to the extent allowed by law.

### SIXTH CAUSE OF ACTION
### VITO LOGRASSO V. WWE
### (NEGLIGENT MISREPRESENTATION)

206.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

207.   WWE negligently and/or recklessly misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and related injuries.

208.   WWE materially misrepresented the risks faced by Plaintiff related to head, back, and spine injuries through misleading public statements, requiring Plaintiff to fight through the pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

209.   WWE negligently failed to disclose material information to its wrestlers regarding the link between head injuries suffered while wrestling for WWE and the resulting negative effects and cognition-impairing conditions.

210.   WWE actively omitted true information at a time when it knew, or should have known, because of its superior position of knowledge, that Plaintiff faced serious health problems if they returned to the ring too soon after sustaining a concussion.

211.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

212.   WWE and/or the WWE's "Talent Wellness Program," had no reasonable ground for believing its statements to be true.

213.   WWE intended to induce Plaintiff's reliance on these misrepresentations.

214.   Plaintiff justifiably and reasonably relied on WWE's negligent misrepresentations to his detriment when wrestling for WWE, relying on what WWE said and failed to say to WWE wrestlers about concussions and other head injuries.

215.   Plaintiff acted and failed to act in reliance on these statements to his detriment.

216.   WWE failed to act with reasonable care by negligently failing to disclose material information to Plaintiff regarding the link between concussions and brain injury and the resulting negative effects and cognition-impairing conditions.

217.   Defendant had a duty to disclose to Plaintiff any actual knowledge is possessed conceding such injuries and any associated risks it was aware of.

218.   As a direct and proximate result of these misrepresentations, omissions, and concealments, Plaintiff has been damaged, as alleged herein.

219.   As a direct and proximate result of WWE's negligent misrepresentations, Plaintiff has suffered and continues to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, and emotional distress. Plaintiff seeks the full measure of damages allowed under applicable law.

220.   Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud, and/or malice entitling Plaintiff to an award of punitive damages to the extent allowed by law.

### SEVENTH CAUSE OF ACTION
### EVAN SINGLETON V. WWE
### (FRAUDULENT DECEIT)

221.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

222.   WWE materially misrepresented the risks faced by Plaintiff related to head injuries.   WWE, through misleading and deceptive public statements and

published articles, and downplayed known long-term health risks of concussions to Plaintiff.

223.  WWE made these misrepresentations and actively concealed adverse information at a time when it knew, or should have known, that Plaintiff faced serious health problems if he was forced to return to the ring too soon after suffering brain trauma.

224.  WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

225.  WWE intended to induce Plaintiff's reliance on the misrepresentations and to induce him to alter his position related to injury and risk.

226.  Plaintiff justifiably and reasonably relied on these misrepresentations when wrestling for WWE.  Had he known the true risks to his health, he would have acted to protect his health.

227.  WWE's misrepresentations were substantial factors leading to Plaintiff's injuries.

228.  As a direct and proximate result of WWE's misrepresentations, Plaintiff experienced pain and suffering and suffered serious permanent and debilitating injuries, including but not limited to neurological damage and CTE, which caused

and/or contributed to the injuries described above, as well as emotional distress, pain and suffering, and economic and noneconomic damages.

## EIGHTH CAUSE OF ACTION
## VITO LOGRASSO V. WWE
## (FRAUDULENT DECEIT)

229.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

230.   WWE materially misrepresented the risks faced by Plaintiff related to head injuries.   WWE, through misleading and deceptive public statements and published articles, downplayed known long-term health risks of concussions to Plaintiff.

231.   WWE made these misrepresentations and actively concealed adverse information at a time when it knew, or should have known, that Plaintiff faced serious health problems if they were forced to return to the ring too soon after suffering brain trauma.

232.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

233.   WWE intended to induce Plaintiff's reliance on the misrepresentations and to induce him to alter his position related to injury and risk.

234.   Plaintiff justifiably and reasonably relied on these misrepresentations when wrestling for WWE.  Had he known the true risks to his health, he would have acted to protect his health.

235.   WWE's misrepresentations were substantial factors leading to Plaintiff's injuries.

236.   As a direct and proximate result of WWE's misrepresentations, Plaintiff experienced pain and suffering and suffered serious permanent and debilitating injuries, including but not limited to neurological damage and CTE, which caused and/or contributed to the injuries described above, as well as emotional distress, pain and suffering, and economic and noneconomic damages.

**NINTH CAUSE OF ACTION
EVAN SINGLETON V. WWE
(NEGLIGENCE)**

237.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

238.    WWE has a duty to Plaintiff, based in part on voluntarily assumptions of duties, regarding safety and head trauma.

239.   Yet, as previously outlined throughout this Complaint, WWE has failed to discharge this duty non-negligently.

240.   WWE had and continues to have a duty to exercise reasonable care in training, techniques, medical advice, prescription requirements, and medical monitoring and diagnosing of injuries such as concussions and sub-concussions during performances.

241.   Defendant owed a duty to Plaintiff to exercise reasonable care in the safety and quality control of its wrestling matches.

242.   Defendant was aware, or reasonably should have been aware, that concussion injuries were prevalent in its events and posed great risk to its wrestlers, including Plaintiff.

243.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

244.   As a direct and proximate result of the Defendant's negligent acts and omissions as previously stated, Plaintiff suffered traumatic brain damage from sustained concussions, sub-concussions, and CTE, and have an increased risk of further concussions and sub-concussions, an increased severity of concussions and sub-concussions, disfiguring scarring and physical injury, loss of mental acuity and acumen, loss of short-term memory, loss of awareness, depression, loss of a healthier state of being, as well as other symptoms and disorders resulting from their severe injuries.

245.   As a direct and proximate cause of the foregoing, Plaintiff has suffered and will continue to suffer damages and economic loss described fully above, in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**VITO LOGRASSO V. WWE**
**(NEGLIGENCE)**

246.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

247.   WWE has a duty to Plaintiff, based in part on voluntarily assumptions of duties, regarding safety and head trauma.

248.   Yet, as previously outlined throughout this Complaint, WWE has failed to discharge this duty non-negligently.

249.   WWE had and continues to have a duty to exercise reasonable care in training, techniques, medical advice, prescription requirements, and medical monitoring and diagnosing of injuries such as concussions and sub-concussions during performances.

250.   Defendant owed a duty to Plaintiff to exercise reasonable care in the safety and quality control of its wrestling matches.

251.   Defendant was aware, or reasonably should have been aware, that concussion injuries were prevalent in its events and posed great risk to its wrestlers, including Plaintiff.

252.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to

Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

253. As a direct and proximate result of the Defendant's negligent acts and omissions as previously stated, Plaintiff suffered traumatic brain damage from sustained concussions, sub-concussions, and CTE, and have an increased risk of further concussions and sub-concussions, an increased severity of concussions and sub-concussions, disfiguring scarring and physical injury, loss of mental acuity and acumen, loss of short-term memory, loss of awareness, depression, loss of a healthier state of being, as well as other symptoms and disorders resulting from their severe injuries.

254. As a direct and proximate cause of the foregoing, Plaintiff has suffered and will continue to suffer damages and economic loss described fully above, in an amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**EVAN SINGLETON V. WWE**
**(MEDICAL MONITORING)**

255. Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

256. Repetitive blows to the head during WWE events have a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the

gradual build-up of Tau protein – sometimes over decades – causes CTE and related disorders.

257.   The effects of WWE's negligence and the circumstances it subjected wrestlers to may lead to latent physical changes which ultimately cause significant neurological impairment.

258.   Wrestling exposed Plaintiff to hazardous conditions and out-of-the ordinary risks of harm. Repetitive head traumas to which the Plaintiff have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiff's exposure to the risks of harm as described above would have been materially lower.

259.   Accordingly, the repetitive head impacts sustained by wrestlers exposed Plaintiff to subtle and repetitive changes within the brain on the cellular level. For that reason, the environment within which Plaintiff has sustained repetitive head impacts exposed them to substantive hazards.

260.   Plaintiff suffered latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and related disorders. These are present injuries that increase the risk of future harm.

261.   WWE wrestlers were and continue to be:

   a.  Exposed to greater than normal background levels;

   b.  Of a proven hazardous substance, condition, activity, or event;

    c. **Which was caused by the Defendant's willful, wanton, reckless or negligent acts; and,**

    d. **As a proximate result of the exposure, Plaintiff has significantly increased risk of contracting serious latent diseases.**

    e. **Further, a monitoring procedure exists that makes the early detection of the disease possible; and,**

    f. **Such a monitoring regime is different from that normally recommended in the absence of the exposure or activities at issue here;**

    g. **All of which is reasonably necessary according to contemporary scientific principles.**

262. **By monitoring and testing the affected brain and body of the Plaintiff, it can be determined whether he has suffered additional injuries.**

263. **By monitoring and testing Plaintiff, the risk that Plaintiff will suffer further long term injuries, disease, and losses will be significantly reduced.**

264. **The medical monitoring regime must include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with WWE wrestling. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiff suffered as a result of participating in WWE events.**

265. **Accordingly, Defendant should be required to establish a medical monitoring program that, among other things:**

a. Establishes a trust fund, in an amount to be determined, to pay for the medical monitoring of Plaintiff, as frequently as determined to be medically necessary, as well as to pay to develop and research other methods by which the risk of those affected can be reduced; and

b. Provides information to treating physicians to aid them in detecting such injuries.

266. Plaintiff has no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of concussions and repeated sub-concussive blows. Without a Court-approved medical monitoring program as described herein, Plaintiff will continue to face unreasonable risks alleged herein.

267. Plaintiff is entitled to damages in an amount to be determined at trial.

**TWELFTH CAUSE OF ACTION**
**VITO LOGRASSO V. WWE**
**(MEDICAL MONITORING)**

268. Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

269. Repetitive blows to the head during WWE events have a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau protein – sometimes over decades – causes CTE and related disorders.

270.   The effects of WWE's negligence and the circumstances it subjected wrestlers to may lead to latent physical changes which ultimately cause significant neurological impairment.

271.   Wrestling exposed Plaintiff to hazardous conditions and out-of-the ordinary risks of harm. Repetitive head traumas to which the Plaintiff have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiff's exposure to the risks of harm as described above would have been materially lower.

272.   Accordingly, the repetitive head impacts sustained by wrestlers exposed Plaintiff to subtle and repetitive changes within the brain on the cellular level. For that reason, the environment within which Plaintiff has sustained repetitive head impacts exposed them to substantive hazards.

273.   Plaintiff suffered latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and related disorders. These are present injuries that increase the risk of future harm.

274.   WWE wrestlers were and continue to be:

    a.   Exposed to greater than normal background levels;

    b.   Of a proven hazardous substance, condition, activity, or event;

    c.   Which was caused by the Defendant's willful, wanton, reckless or negligent acts; and,

d. As a proximate result of the exposure, Plaintiff have significantly increased risk of contracting serious latent diseases.

e. Further, a monitoring procedure exists that makes the early detection of the disease possible; and,

f. Such a monitoring regime is different from that normally recommended in the absence of the exposure or activities at issue here;

g. All of which is reasonably necessary according to contemporary scientific principles.

275.   By monitoring and testing the affected brain and body of the Plaintiff, it can be determined whether he has suffered additional injuries.

276.   By monitoring and testing Plaintiff, the risk that Plaintiff will suffer additional long term injuries, disease, and losses will be significantly reduced.

277.   By monitoring and testing Plaintiff, the risk that Plaintiff will suffer long term injuries, disease, and losses without adequate treatment will be significantly reduced.

278.   The medical monitoring regime must include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with WWE wrestling. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiff suffered as a result of participating in WWE events.

279.  Accordingly, Defendant should be required to establish a medical monitoring program that, among other things:

  a.  Establishes a trust fund, in an amount to be determined, to pay for the medical monitoring of Plaintiff, as frequently as determined to be medically necessary, as well as to pay to develop and research other methods by which the risk of those affected can be reduced; and

  b.  Provides information to treating physicians to aid them in detecting such injuries.

280.  Plaintiff has no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of concussions and repeated sub-concussive blows. Without a Court-approved medical monitoring program as described herein, Plaintiff will continue to face unreasonable risks alleged herein.

281.  Plaintiff is entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.  Compensatory and punitive damages;

2.  Costs;

3.  Interest as allowed by law; and,

4.  For such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.


DATE:        June 15, 2015

By:_ /s/ William M. Bloss_____
**William M. Bloss**
**Federal Bar No: CT01008**
**Koskoff, Koskoff & Bieder**
**350 Fairfield Avenue**
**Bridgeport, CT  06604**
**Telephone: 203-336-4421**
**Facsimile: 203-368-3244**

**Charles J. LaDuca**
**Brendan Thompson**
**CUNEO GILBERT & LADUCA, LLP**
**8120 Woodmont Avenue, Suite 810**
**Bethesda, MD 20814**
**Telephone: (202) 789-3960**
**Facsimile: (202) 789-1813**
**charles@cuneolaw.com**
**brendant@cuneolaw.com**

**Robert K. Shelquist**
**Scott Moriarity**
**LOCKRIDGE GRINDAL NAUEN**
**P.L.L.P.**
**100 Washington Ave., S., Suite 2200**
**Minneapolis, MN 55401-2179**
**Telephone: (612) 339-6900**
**Facsimile: (612) 339-0981**
**rkshelquist@locklaw.com**
**samoriarity@locklaw.com**

**Harris L. Pogust, Esquire**
**Pogust Braslow & Millrood,LLC**
**Eight Tower Bridge**
**161 Washington Street**
**Suite 940**
**Conshohocken, PA 19428**
**Telephone: (610) 941-4204**
**Facsimile: (610) 941-4245**
**hpogust@pbmattorneys.com**

**Konstantine W. Kyros**
**KYROS LAW OFFICES**
**17 Miles Rd. Hingham, MA 02043**
**Telephone: (800) 934-2921**
**Facsimile: 617-583-1905**
**kon@kyroslaw.com**

**Erica Mirabella**
**CT Fed. Bar #: phv07432**
**MIRABELLA LAW LLC**
**132 Boylston Street, 5th Floor**
**Boston, MA 02116**
**Telephone: 617-580-8270**
**Facsimile: 617-580-8270**
**Erica@mirabellaLLC.com**

**Attorneys for Plaintiffs**